## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

| | |
|---|---|
| KATINA CROWDER, | : |
| Plaintiff, | : |
| v. | : Action No. 2:17-cv-00186 |
| NANCY A. BERRYHILL,<br>Acting Commissioner,<br>Social Security Administration, | : |
| Defendant. | : |

### REPORT AND RECOMMENDATION

Plaintiff Katina Denice Crowder ("Plaintiff") filed a complaint, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), that seeks judicial review of the final decision of the Defendant, Nancy A. Berryhill, the Acting Commissioner of the Social Security Administration ("the Commissioner"), which denied Plaintiff's claim for Disability Insurance Benefits ("DIB") pursuant to Title II, and her claim for Supplemental Social Security Income ("SSI") pursuant to Title XVI, of the Social Security Act. Both parties have filed Motions for Summary Judgment, ECF Nos. 8 and 10, with briefs in support, ECF Nos. 9 and 11, which are now ready for recommended resolution.

This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. §§ 636(b)(1)(B)-(C), Federal Rule of Civil Procedure 72(b), Local Civil Rule 72, and the April 2, 2002 Standing Order on Assignment of Certain Matters to

United States Magistrate Judges.  ECF No. 5.  For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 8, be **DENIED**, the Commissioner's Motion for Summary Judgment, ECF No. 10, be **GRANTED**, and the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## I. PROCEDURAL BACKGROUND

Plaintiff filed an application for a period of disability and disability insurance benefits ("DIB") on or about October 15, 2012, and an application for supplemental security income ("SSI") on September 9, 2014, alleging that she became disabled on October 5, 2012 due to seizure disorder, obesity, ruptured Achilles tendon, osteoarthritis, bone degeneration, and vitamin D deficiency.  R. at 38, 180-94, 248.[1]  Plaintiff's application was initially denied on November 21, 2013, and denied again upon reconsideration on April 17, 2014  R. at 38, 134-38, 140-42.  Plaintiff requested a hearing in front of an administrative law judge, which was held on November 18, 2015 before Administrative Law Judge Jeffrey M. Jordan ("the ALJ").  R. at 38, 63-94.  The ALJ issued his written decision on December 29, 2015, denying Plaintiff's application and finding Plaintiff was not disabled.  R. at 38-54.  On February 7, 2017, the Appeals Council for the Office of Disability and Adjudication ("Appeals Council") denied Plaintiff's request for review of the ALJ's decision, making the ALJ's hearing decision the final decision of the Commissioner.  R. at 1-4.  After exhausting her administrative remedies, Plaintiff filed her Complaint for judicial review of the Commissioner's final decision on April 4, 2017.  ECF No. 1.  The Commissioner filed an Answer on July 10, 2017.  ECF No. 4.  Both parties filed

---

[1] "R." refers to the certified administrative record that was filed under seal on July 11, 2017, ECF No. 6, pursuant to Local Civil Rules 5(B) and 7(C)(1).

Motions for Summary Judgment, ECF Nos. 8 and 10, and Plaintiff filed a Reply in support of her Motion, ECF No. 12, and the matter is now ripe for recommended adjudication.

## II. RELEVANT FACTUAL BACKGROUND

In her applications, filed on October 15, 2012 (Title II – DIB) and September 9, 2014 (Title XVI – SSI), Plaintiff alleges disability due to seizure disorder, obesity, ruptured Achilles tendon, osteoarthritis, bone degeneration, and vitamin D deficiency with a disability onset date of October 5, 2012. R. at 38, 180-94. 248. At the time of the ALJ's December 29, 2015 decision, Plaintiff was an English-speaking, forty-two year old woman with a high school education and a certificate in child psychology who was previously employed by two different companies as an aide for persons with intellectual disabilities and as a supervisor for other aides. R. at 73-76, 88-89. At the November 18, 2015 hearing before the ALJ, Plaintiff appeared, was represented by an attorney, J. Russell Fentress, IV ("Plaintiff's counsel"), and supplemented her medical records by providing additional information via testimony. R. at 63-94. Robert Edwards, an impartial Vocational Expert ("the VE") also testified. R. at 88-93. At the end of the hearing, the ALJ agreed to hold the record open for a period of ten days for Plaintiff's counsel to submit additional records from Plaintiff's treating neurologist. R. at 67-68, 93. The record included the following factual background for the ALJ to review:

Plaintiff resides in a two story townhouse in Virginia Beach, Virginia with her adult stepdaughter, and she is legally separated from her husband. R. at 70-71. She is a high school graduate, and earned a child psychology certificate through correspondence classes that qualified her to do counseling work. R. at 72. Function Reports completed by Plaintiff provided additional details. *See* R. at 279-82, 284-85, 291-316. In a self-populated Function Report dated

3

December 7, 2012, Plaintiff reported no problems with personal care (to include dressing, bathing, feeding herself, using the bathroom, etc.) and reported that she was able to prepare her own meals on a daily basis, performed laundry, light housekeeping, and shopped for groceries. R. at 279-81. She also reported no problems with paying bills, counting change, and maintaining a checkbook and savings account. R. at 282. In more recent self-populated Function Reports dated October 18, 2013 and January 18, 2014, Plaintiff similarly reported that she prepared her own meals, shopped for groceries, was able to care for herself, and that she could manage her finances. R. at 291-92, 313-14. Plaintiff reported that she was able to follow written and verbal instructions "fine," but would sometimes forget what she was supposed to do after receiving verbal instructions. R. at 284-85. Plaintiff reported no problems getting along with others and authority figures, and stated that she was able to pay attention long enough to watch an hour and a half movie. R. at 285. Plaintiff also has an unrestricted driver's license, and leaves the house several times a week to go to the grocery store, doctors' appointments, and to complete other errands. R. at 76, 291-92. At the hearing, Plaintiff's testimony focused on Plaintiff's reports of persistent nocturnal seizures, which she has been documenting in a "seizure diary" since January of 2014. R. at 78, 333-37 (Seizure Diary Entries). Plaintiff testified that these nocturnal seizures do not wake her up, and that the way she knows she experienced a nocturnal seizure is because someone will hear her having one and wake her up, or she will wake up the next day with severe head and neck pain and feel noticeably tired. R. at 79-80. Plaintiff reported that these nocturnal seizures occur approximately once or twice a month, and typically coincide with Plaintiff's menstrual cycle. R. at 80.

4

During her fifteen year career as a direct support professional, Plaintiff worked for two different companies Just People and Volunteers of America, and served as an aide and counselor for individuals with intellectual disabilities, a position which required Plaintiff to supervise and assist with the daily living activities of intellectually disabled individuals living in a group home environment. R. at 73-76. In the first position, as a full-time supervisor for Just People, Plaintiff was responsible for supervising counselors who worked as aides/counselors to the intellectually disabled, had the power to hire and fire, and subordinates submitted their timesheets to Plaintiff. R. at 75-76. In January 2011, Plaintiff ceased fulltime employment as a supervisor with Just People after the company proposed her demotion due to complaints of rude, belligerent, unprofessional and sarcastic conduct. R. at 74, 242-43. According to Plaintiff, she opted not to accept the demoted position because she was "not interested" in working in that position. R. at 75, 243. In April 2011, Plaintiff subsequently accepted employment as a direct support professional with Volunteers of America on a per diem basis, meaning that Plaintiff worked on an as needed basis, approximately two days a week, and in eight hour shifts. R. at 73-74, 77. That employment continued from approximately April 2011 through October 2012, at which time Plaintiff took a hiatus to undergo surgery on her Achilles tendon. R. at 77. At the company's repeated requests, in or around June 2013, Plaintiff briefly returned to work with Volunteers of America. R. at 77-78 ("They kept calling me to come back to work."). However, Plaintiff's employment with Volunteers of America officially ceased sometime in summer 2013 because the shift work was interfering with the timing for Plaintiff to take her seizure medication and she felt unable to meet the driving demands of the job. R. at 78 ("I could not work as I had tried to explain to my supervisor because of the increase in my seizure medication. I had to get

5

off work by a certain time to take my medicine and with that job, if a client had a behavior or something, then I would have to stay over my shift and miss my seizure medication. For my last shift I did work, I ended up staying over my shift and missed my medication and I had a really bad seizure. And so, there I didn't go back to work because it was interfering with my medication and I couldn't drive like they needed me to drive and things of that nature.").

Plaintiff testified that she suffers from depression, anxiety, and PTSD on a daily basis that is exacerbated by stress and a lack of sleep, which in turn is created by anxiety over her physical pain and nocturnal seizures. R. at 83-85. Plaintiff also testified to a myriad of physical health issues, namely, that in addition to the pain and fatigue from her nocturnal seizures, she experiences chronic pain in her joints, neck, shoulders, elbows, knees, ankle, and her feet. R. at 81. Plaintiff obtains limited relief from such pain because she is allergic to most narcotic pain medication, so she has been prescribed morphine and sulfate to be taken every four to six hours, but she usually only takes it around bedtime because it makes her drowsy. R. at 82. Plaintiff is also prescribed Valium for anxiety and as a muscle relaxant, and also takes 800 milligram Motrin. R. at 82. On a typical day, Plaintiff testified that her pain and fatigue require her to lie down for approximately six hours out of an eight hour day. R. at 80-81. Plaintiff testified that she was recently diagnosed with a "rare thing called Eagle Syndrome where the ligaments . . . have calcified and over grown [sic] and so they are putting pressure on the nerves in these regions, which cause me to have increased headaches and neck and shoulder pain," but that she was supposed to have a second surgery to remove the calcified ligament. R. at 82-83. Plaintiff's testimony supplemented the voluminous medical records before the ALJ.

Mental Health

In May of 2003, Dr. Salvador A. Arella ("Dr. Arella") opined that Plaintiff suffered from major depression, anxiety disorder not otherwise specified, and PTSD. R .at 346 ("Exhibit B1F"). At the insistence of her treating neuropsychologist, in 2015, Plaintiff sought mental health treatment from a therapist, Kashina Simms, LCSW ("Ms. Simms"). *See* R. at 1019 ("She is amenable to psychotherapy."). However, Plaintiff attended only two therapy sessions with Ms. Simms, on September 28, 2015 and October 6, 2015. *See* R. at 950-53 ("Exhibit B45F").

Emergency Department/Patient First

Plaintiff's medical history is significant for lapses in health insurance coverage, at which time she utilized the services of various emergency rooms and clinics for treatment of chest pain, shortness of breath, facial swelling, and throat pain/swollen lymph nodes. *See, e.g.*, R. at 444-47 ("Exhibit B10F" – Patient First); *id.* at 606-18 ("Exhibit B28F" – Chesapeake Regional Medical Center Emergency Department); *id.* at 665 ("Exhibit B29F – Chesapeake General Hospital Emergency Department); *id.* at 753-82 ("Exhibit B32F" – Sentara Princess Anne Hospital); *id.* at 783-87 ("Exhibit B33F" – Sentara Urgent Care); *id.* at 837-38 ("Exhibit B38F" – Patient First).

Rheumatology

Plaintiff began treatment with Dr. Brinda Dixit ("Dr. Dixit") for treatment of her rheumatoid arthritis, osteoarthritis, and mixed connective tissue disease in the fall of 2010. R. at 301, 353-81 ("Exhibit B4F"). However, following her visit with Dr. Dixit on May 20, 2011, Plaintiff lost her health insurance and was unable to continue seeing Dr. Dixit. R. at 900. Beginning on November 8, 2011, Plaintiff's rheumatoid arthritis was treated by Dr. Janice Sherwood ("Dr. Sherwood") of Arthritis Consultants of Tidewater. R. at 426 ("This is her first

7

visit to the clinic. She is self-referred and presents for a consultation. Medical problems to be addressed today include rheumatoid arthritis. . . . She has been seeing Dr. Dixit (last visit in May) but she no longer takes her insurance."). It appears that Dr. Sherwood continued to treat Plaintiff until March 2012. *See* R. at 426-41 ("Exhibit B9F").

Plaintiff returned to Dr. Dixit on June 12, 2014, complaining of joint pain all over her body with "more pain and flares in the summer v. the winter." R. at 900. On June 20, 2014, pursuant to Dr. Dixit's referral, Plaintiff submitted to a bone scan due to her complaints of joint pain. The impression of the June 2014 bone scan was documented as "[f]indings consistent with multifocal arthropathy, unchanged compared to 3/7/11." R. at 904. *See also* R. at 595 (March 7, 2011 bone scan results). On July 24, 2014, Plaintiff returned to Dr. Dixit to discuss the unremarkable findings of the June 20, 2014 bone scan, at which time Plaintiff reported pain in her hands, shoulders, and knees, but "less pain, less stiffness and joint swelling since on Plaquenil and no side effects." R. at 896. On October 24, 2014, Plaintiff returned to Dr. Dixit for a follow-up with complaints of pain in her lower back, knees, and toes, and pain flares in her wrists, hands, and thumbs. R. at 892. Plaintiff was directed to continue on normal medication and to schedule a follow-up in four to six weeks. R. at 894 ("Follow Up 4-6 Weeks (Reason: SSA)").[2] On December 1, 2014, Plaintiff saw Dr. Dixit and displayed a normal gait and reported that her RA [rheumatoid arthritis] was active, "[s]he feels uncomfortable with the RA meds and she does not want to take anything at this time." R. at 890. At the end of the visit, Plaintiff indicated that she would restart her current RA medication (Plaquenil) and "think about starting" the Sulfasalazine, or "SSA." R. at 890. On February 20, 2015, Plaintiff returned to Dr. Dixit

---

[2] It appears that "SSA" is a reference to Sulfasalazine, which is a class of drugs used to treat some autoimmune diseases because it can help reduce joint pain and inflammation.

and reported pain in her wrists, ankles, and knees, which she attributed to the cold weather, but admitted that she never started taking the SSA "because she was afraid of the side effects that might occur." R. at 886. Dr. Dixit noted that Plaintiff

> is noncompliant and we have discussed this in detail. She states she is afraid of taking the sulfasalazine and other meds. She feels comfortable with the Plaquenil. She does not want to take other meds at this time. *She states that she understands that it is her fault and that she just does not want to take more meds, and she will continue to have pain and inflammation.*

R. at 887 (emphasis added). Plaintiff was directed to follow-up in six months. R. at 888. On August 11, 2015, Plaintiff returned for a follow-up with Dr. Dixit and reported that although she was experiencing neck, shoulder, and knee pain, she "[o]therwise feels that Plaquenil is helping her hands/feet swelling, pain[,] and some of her fatigue" and she had no side effects. R. at 882.

### Primary Care Physician/Asthma

Dr. Robert Bademian ("Dr. Bademian") is Plaintiff's Primary Care Physician and manages treatment of Plaintiff's asthma. R. at 961-65. Although an April 24, 2014 Progress Note by Dr. Bademian indicated that Plaintiff's asthma was "worse this spring with needing albuterol bid[3] at least," R. at 961, Dr. Bademian continued to treat Plaintiff's asthma with an albuterol inhaler, R. at 964. At a May 1, 2014 visit with Dr. Bademian, Plaintiff's lungs were observed to be "clear" and she was continued on the previous asthma treatment plan. R. at 967-68, 970. On May 21, 2014, Plaintiff saw Dr. Bademian for a follow-up after being diagnosed with pneumonia, but Dr. Bademian once again observed Plaintiff's lungs to be "clear" and directed that she continue to follow the current treatment plan. R. at 973-76. On August 22, 2014, Plaintiff saw Dr. Bademian for an asthma follow-up and reported "[r]are albuterol use"

---

[3] "BID" or "bid" is short for the Latin phrase "bis in die" and means twice a day.

9

and was directed to continue with existing treatment plan.  R. at 979-81.  On February 24, 2015, Plaintiff returned to Dr. Bademian for asthma follow-up and reported that she "[h]as had more wheezing despite singulair with colder weather past 3 months.  Uses albuterol about bid.  No cough or doe [dyspnea on exertion]."[4]  R. at 984.  Dr. Bademian concluded the February 24, 2015 visit with directing Plaintiff to continue with the existing asthma treatment and noted that he would "add inhaled steroid if asthma does not improve with warmer weather."  R. at 986-87. At the next visit with Dr. Bademian on June 25, 2015, it appears that Plaintiff had no complaints about her asthma and the majority of the visit was spent discussing her chief complaint: depression.  R. at 989-1002.  On August 6, 2015, Plaintiff returned to Dr. Bademian to follow-up regarding her depression, at which time no mention was made of her asthma, Plaintiff reported "[n]o worsening depression," and Dr. Bademian noted that Plaintiff displayed normal mood, memory, affect, and judgment.  R. at 1003-06.

Allergy/Immunology

On November 22, 2010 and pursuant to a referral from Dr. Sequita Morris ("Dr. Morris"), Plaintiff was examined by allergist/immunologist Dr. Craig S. Keonig ("Dr. Koenig") to investigate the cause of Plaintiff's episodic facial swelling and rashes/hives.  R. at 365-67. After administering various tests, Dr. Koenig diagnosed Plaintiff with what he suspected to be cutaneous vasculitis, and recommended prophylactic use of an antihistamine (Zyrtec), and directed Plaintiff to follow-up with him.  R. at 366.

---

[4] Dyspnea on exertion or "exertional dyspnea" means shortness of breath experienced upon mild exertion such as walking up stairs.

<u>Ear, Nose, and Throat</u>

Plaintiff began seeing ear, nose, and throat specialist Dr. David Leonard ("Dr. Leonard") on or about December 30, 2010 for treatment of and surgery for facial swelling, dysphagia, otalgia, and masses in her head/neck, and throat. R. at 301. On or about September 20, 2013, Dr. Leonard removed two benign masses from Plaintiff's throat. R. at 688, 620-22. In July 2015, Plaintiff saw ear, nose, and throat specialist Dr. Jeffrey Kuhn (Dr. Kuhn") for recurrent ear, throat, and shoulder pain. After examining Plaintiff in July 2015 and obtaining CT scans, Dr. Kuhn diagnosed Plaintiff with "Eagle's Syndrome." R. at 844-51. On August 28, 2015, Plaintiff underwent surgery with otolaryngologist Dr. John T. Sinacori ("Dr. Sinacori") to correct an elongated styloid process (calcified stylohyoid ligament), in the hopes of alleviating Plaintiff's recurrent facial/neck pain and migraines. Upon emergence from anesthesia, Plaintiff was observed to exhibit "pseudo-seizure like activity" and was admitted for overnight observation, but "did not have any further seizure like activity overnight," and was discharged the next day. R. at 840-41.

<u>Orthopedics</u>

On September 23, 2012, Plaintiff was seen at Patient First for heel pain she experienced after she "was at church jumping up and down in the aisles during praising. Somehow misstepped [sic] and has had discomfort ever since then in back of heel. . . . Has a lot of pain with weight bearing." R. at 447 (observing a small heel spur upon x-ray examination). On October 1, 2012, Plaintiff presented to the Sentara Princess Anne Hospital Emergency Department complaining of "left ankle pain from a fall a week ago at church. Pt states: 'I was shouting and praising the Lord, and I fell.' . . . Pt. is unable to bear weight and reports increased

11

pain." R. at 475. Beginning on or about October 2, 2012, Plaintiff saw orthopedic surgeon Dr. Lawrence Shall ("Dr. Shall") for treatment and of her left ankle. R. at 301. On October 5, 2012, Plaintiff elected to have her Achilles tendon repaired by Dr. Shall. R. at 489. Upon emerging from anesthesia, Plaintiff exhibited "seizure-like symptoms" and was admitted to the ICU for observation. R. at 480, 482. On that same day, and pursuant to a referral from Dr. Shall, Plaintiff submitted to an EEG due to a "change in mental status" and the conclusion was that the EEG was normal with "no focal slowing or epileptiform activities noted." R. at 528. The next day, Plaintiff's treating neurologist, Dr. Gilbert M. Snider cleared Plaintiff to be discharged. R. at 528.

Neurology

Plaintiff began treatment with neurologist Dr. Gilbert M. Snider ("Dr. Snider") for an alleged nocturnal seizure disorder and migraines on or about June 1, 2009. Plaintiff continued to see Dr. Snider until July 7, 2015 when he effectively transferred management of Plaintiff's care to fellow neurologist Dr. Hua Wang ("Dr. Wang").[5] R. at 302, 804, 959. On March 16, 2011, Dr. Snider noted that Plaintiff had not appeared for a follow-up from a February 2010 visit after missing or rescheduling appointments on July 28, 2010, August 31, 2010, September 1, 2010, December 1, 2010, and January 19, 2011. R. at 523. At this March 16, 2011 appointment, Dr. Snider stated that Plaintiff's "[m]ental status shows no evidence of anomia, apraxia, aphasia, paraphasic errors of speech, memory deficits." R. at 523. On October 23, 2012, approximately two weeks after Plaintiff filed her application for disability, Dr. Snider directed Plaintiff to

---

[5] In the appeal of her initial denial of benefits, Plaintiff provides April 2009 as the starting date of treatment with Dr. Snider, which is two months earlier than the June 2009 date provided by Dr. Snider in his medical source opinion. *Compare* R. at 302 (Plaintiff's Appeal), *with* R. at 804 (Dr. Snider's opinion). However, this discrepancy makes no difference in the undersigned's ultimate recommendation.

submit to a brain MRI with and without contrast due to "recent breakthrough seizures." R. at 526. The results of the test were described as "a relatively unremarkable MRI of the brain for patient's stated age." R. at 526. On November 13, 2013, Plaintiff saw Dr. Snider "for followup [sic] and management of her seizure disorder. Recently, she has had some breakthrough seizures." R. at 663. Dr. Snider observed Plaintiff to be alert and oriented" with no evidence of anomia, asphasia, parasphasic errors of speech or aprosodic speech," with a normal gait and station, and noted that based on Plaintiff's reports, her nocturnal seizures were "under poor control." R. at 664. Given Plaintiff's throat issues, Dr. Snider noted that he was "limited to what I can prescribe for the patient by her inability to swallow pills and her daytime hypersomnolence[6]," but tweaked the dosage of her medication and the timing for administration in the hope that such changes "will keep her seizures under better control." R. at 664. On January 9, 2015, Dr. Snider referred Plaintiff to neurologist Dr. Hua Wang ("Dr. Wang") to be evaluated for epilepsy surgery. R. at 810.

Pursuant to a referral from Dr. Wang, between April 6 and April 10, 2015, Plaintiff was admitted to the Epilepsy Monitoring Unit at Norfolk General Hospital for long-term video monitoring of her self-reported nocturnal seizure activity with the purpose of "characterize[ing] the event." *See* R. at 993 ("The purpose of this monitor is to characterize this event."). Day 1 (April 6, 2015) was summarized as "a normal EEG[7] recording." R. at 994. Data from April 7 to April 10, 2015 was described as "a normal EEG recording" and "3 typical but mild events were recorded" and LTM (Long Term Monitoring) was discontinued." R. at 994. Ultimately, the impression from this long term video monitoring stated that such recording was "a normal long-

---

[6] Hypersomnolence describes a patient's excessive daytime sleepiness.
[7] EEG stands for "Electroencephalogram."

13

term video-EEG recording.  Patient's typical evident as nocturnal, head jerking and moaning with decreased awareness was recorded and was non-epileptic event." R. at 994.

On May 21, 2015, and pursuant to Dr. Wang's referral, Plaintiff appeared for a Neuropsychological Assessment with neuropsychologist Dr. Melissa P. Hunter ("Dr. Hunter"). R. at 1012-18.  On June 9, 2015, Plaintiff returned to Dr. Hunter for the purpose of discussing the results and impressions of the May 21, 2015 assessment.  Dr. Hunter once again noted that Plaintiff "arrived as scheduled," was unaccompanied, "actively participated" in dialogue regarding the neuropsychological assessment results, "ambulate[d] independently," was "attentive and cooperative," and was amenable to Dr. Hunter's suggested plan of psychotherapy and expressed a willingness to consider medicated management of her depression.  R. at 1019.

Consultative Examination

On November 15, 2013, Plaintiff was examined by neurologist Dr. Sarbjot Dulai, ("Dr. Dulai"), a state consultative examiner.  R. at 680-85 ("Exhibit B30F").  During this examination, Plaintiff was observed to be "alert and oriented," was "cooperative and put forth her best effort throughout the examination," and presented with normal attention span and concentration.  R. at 682.  Dr. Dulai noted Plaintiff's self-reported history of depression in the past, but that Plaintiff was "[c]urrently on no medication."  R. at 682.  Plaintiff also reported that despite joint pain, nocturnal seizures, pain in her back, and left Achilles tendon pain, she "can do all activities of daily living."  R. at 681.  Ultimately, Dr. Dulai assessed Plaintiff as having no limitations with sitting, limited to four hours of standing/walking in an eight hour workday, certain postural limitations, and limited to frequently lifting ten pounds and occasionally lifting twenty pounds. R. at 683.

14

### State Agency Doctors

Subsequent to Dr. Dulai's consultative examination of Plaintiff, two State agency doctors, Dr. Luc Vinh ("Dr. Vinh") and Dr. Patricia Staehr ("Dr. Staehr") also completed assessments of Plaintiff's medical records on November 21, 2013 (Dr. Vinh) and on April 8, 2014 (Dr. Staehr).[8]  *See* R. at 101-14 ("Exhibit B1A"), *id.* at 116-32 ("Exhibit 3A").  Both determined that Plaintiff could perform work at a light exertional level with some limitations, including occasionally lifting/carrying twenty pounds, frequently lifting/carrying ten pounds, standing/walking for four hours and sitting for six hours in an eight hour work day, and avoid concentrated exposure to extreme heat and even moderate exposure to hazards due to Plaintiff's seizures. R. at 111, 128-29.

### Vocational Expert Testimony

As previously noted, an impartial VE appeared and testified at the November 18, 2015 hearing before the ALJ. R. at 88-93. The ALJ presented the VE with a hypothetical, and then Plaintiff's attorney was given the opportunity to inquire and present hypotheticals to the VE. With regard to the ALJ's hypothetical, the ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work background, who is limited to light work, can only lift and carry from waist to chest level, stand and walk about four hours and sit for six hours in an eight hour work day, needs the option to sit or stand no longer than fifteen to thirty minutes before having to alternate positions for a few minutes for comfort, must avoid climbing ladders, ropes, and scaffolds, crawling, and kneeling, but perform other postural occasionally, must avoids working around hazards such as moving, dangerous machinery and unprotected heights, avoid concentrated exposure to respiratory irritants, and extreme temperatures and humidity, and

---

[8] Dr. Staehr's assessment of Plaintiff was completed at the reconsideration level. *See* R. at 116.

is also limited to simple, routine, low stress tasks (defined as requires work involving minimal changes in the routine, avoid fast paced work such as assembly line jobs with production quotas), occasional brief, superficial interaction with the public, coworkers, and supervisors.  R. at 89-90. The VE testified that such a hypothetical person would be unable to perform Plaintiff's past work, but that such an individual could perform light or sedentary unskilled jobs such as an office helper, a clerical checker, a mail clerk, an office clerk, an electronics inspector, or a sorter, and that such positions would, in the VE's experience, allow the hypothetical individual to alternative between sitting and standing and do only four hours of standing and walking in an eight hour work day.  R. at 90-91. Building off that first hypothetical, the ALJ asked the VE if such an individual could perform the aforementioned positions if she needed to be absent from work once or twice a month due to fatigue, side effects of medication, and nocturnal seizures, to which the VE answered affirmatively.  R. at 91-92 (VE: "That would be the limit the individual could miss.  If it is more than two [times per month] it is going to eliminate all work.").

When Plaintiff's counsel was given the opportunity to inquire, he asked the VE, assuming the same hypothetical individual as presented by the ALJ, if that same person was off task fifteen percent of the day or more, whether that would preclude full time work in the national economy, to which the VE answered affirmatively.  R. at 92.  Plaintiff's counsel next asked whether all full time work would similarly be precluded if the same hypothetical individual had an impairment that rendered her unable to maintain a regular employment schedule, complete tasks in a customary productions schedule, concentrate in a work setting, and she was unable to regularly complete a normal work day, to which the VE also answered affirmatively.  R. at 92.

### III. **THE ALJ'S FINDINGS OF FACT AND CONCLUSIONS OF LAW**

A sequential evaluation of a claimant's work and medical history is required in order to determine if the claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). The ALJ conducts a five-step sequential analysis for the Commissioner, and it is this process that the Court examines on judicial review to determine whether the correct legal standards were applied and whether the resulting final decision of the Commissioner is supported by substantial evidence in the record. *Mastro*, 270 F.3d at 177. The ALJ must determine if

> (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment.

*Strong v. Astrue*, No. 8:10-cv-357-CMC-JDA, 2011 WL 2938084, at *3 (D.S.C. June 27, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (noting that substantial gainful activity is "work activity performed for pay or profit."); *Underwood v. Ribicoff*, 298 F.2d 850, 851 (4th Cir. 1962) (noting that there are four elements of proof to make a finding of whether a claimant is able to engage in substantial gainful activity)). "An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability." *Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014) (citing 20 C.F.R. § 404.1520).

Under this five-step sequential analysis, the ALJ made the following findings of fact and

conclusions of law:  First, the ALJ determined that Plaintiff had not engaged in substantial gainful activity ("SGA") since October 5, 2012, the alleged onset of disability date.[9]  R. at 40.

Second, the ALJ found that Plaintiff has the following severe impairments: osteoarthritis, rheumatoid arthritis ("RA"), obesity, post-traumatic stress disorder ("PTSD"), depression, pseudo seizures, migraines, asthma, residual effects of status post Achilles tendon repair, and Eagle's syndrome.  R. at 41.  The ALJ concluded these aforementioned impairments were "severe" because "[e]ach of these conditions causes more than minimal limitations in [Plaintiff's] ability to perform basic work activities and, therefore, is severe." R. at 41.  In arriving at this conclusion, the ALJ noted that such conditions are "demonstrated by medical signs and laboratory findings." R. at 41.

The ALJ further determined that other alleged impairments, including acid reflux, hiatal hernia, mild degenerative disc disease, and colds, were not severe because "such impairments establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on [Plaintiff's] ability to meet the basic demands of work activity" and "these conditions were being managed medically and amenable to proper control by adherence to recommended medical management and medication compliance" without the need for aggressive treatment. R. at 41.  Additionally, the ALJ noted that although the record contains references to a fibromyalgia diagnosis, "this extensive medical record contains no evidence showing that the claimant exhibits the symptoms associated with this impairment," and therefore deemed Plaintiff's fibromyalgia to be non-severe.  R. at 41. The ALJ employed a thorough analysis (supported by references to the pertinent medical records) before rejecting Plaintiff's

---

[9] Although the ALJ found that Plaintiff earned $752.00 in 2013 when she attempted to return to work, the ALJ determined that "this amount does not rise to substantial gainful activity levels." R. at 40.

other alleged impairments as not severe. *See* R. at 41. With respect to Plaintiff's alleged fibromyalgia, the ALJ found that "the record does not confirm that [Plaintiff] has the requisite number of tender point findings (or any tender points) and there is no evidence that medical doctors have excluded other impairments as required." R. at 41 (citing R. at 347-48 ("Exhibit B2F")).

At the third step, the ALJ considered the aforementioned "severe" impairments (to wit: osteoarthritis, RA, obesity, PTSD, depression, pseudo seizures, migraines, asthma, residual effects of status post Achilles tendon repair, and Eagle's syndrome), and ultimately found that Plaintiff did not have an impairment or combination of physical and/or mental impairments that met or medically equaled any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 41-44 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926).[10]

The ALJ noted that he also considered, as he was required to do by SSR 02-1p, Plaintiff's obesity in determining whether she had medically determinable impairments that were severe and whether those impairments met or equaled any listing, because obesity can medically equal the requirements of a listing by itself or have an adverse impact upon co-existing impairments that such impairments are exacerbated with the obesity that they meet the required level of severity. R. at 41-42 (noting that Plaintiff's body max index is 44.81, which qualifies as morbidly obese). Ultimately, the ALJ concluded that "[n]o medical source opined that

---

[10] The ALJ analyzed and rejected the conclusion that Plaintiff met or medically equaled the listed impairments of asthma under Listing 3.03, Eagle's syndrome, the residual effects of Achilles tendon repair and osteoarthritis under Listing 1.02, and inflammatory arthritis under Listing 14.09. Because Plaintiff does not challenge the ALJ's conclusions regarding these Listings, the undersigned does not detail his evaluation here.

[Plaintiff's] obesity medically equals the criteria of another impairment, and the undersigned cannot assume otherwise." R. at 42 (citing SSR 02-1p).

As to Plaintiff's pseudo-seizures, the ALJ found that such condition did not meet the requirements of Listing 11.02 (convulsive epilepsy) "because she does not have seizures occurring at least once a month in spite of three months treatment." R. at 42. The ALJ further determined that Plaintiff could not meet the requirements of Listing 11.03 (non-convulsive epilepsy) "because she does not have seizures occurring more frequently than once weekly in spite of at least three months of prescribed treatment." R. at 42 (citing 813-27 ("Exhibit B37F").

The ALJ then considered Plaintiff's mental impairments, singly and in combination, under Listings 12.04 and 12.06. R. at 42-44. The ALJ found that regarding "paragraph B" of the criteria of the mental disorder listings, Plaintiff had no marked limitations and no repeated episodes of decompensation. R. at 42-43. As the ALJ observed, "[Plaintiff] has not had mental health treatment or hospital stays for her mental health impairments from 2003 to September of 2015," and even then, Plaintiff had only two therapy sessions since then – one in September 2015 and one in October 2015. R. at 43. The ALJ noted that Plaintiff's daily living functions—cleaning, cooking, bathing, driving, dressing—were only mildly limited, but she was always well groomed and appropriately dressed in her examinations. R. at 43 (citing R. at 66-93 ("Hearing Testimony"); *id.* at 949-55 ("Exhibit B45F"); *id.* at 960-61 ("Exhibit B46F")).

As for social function, the ALJ found that Plaintiff had only moderate limitations characterized by a self-reported history of mood swings and dislike for interacting with others, however, Plaintiff is able to "interact with her family and can go to church." R. at 43. At doctors' appointments, Plaintiff is "cooperative and pleasant," and was similarly "appropriate

and pleasant" at the hearing before the ALJ. R. at 43 (citing R. at 66-93 ("Hearing Testimony");
*id.* at 949-55 ("Exhibit B45F"); *id.* at 960-61 ("Exhibit B46F")).

As for concentration, persistence, or pace, the ALJ found that Plaintiff had a moderate
limitations characterized by a self-reported difficulty in concentrating and completing tasks,
however, during her doctor appointments, Plaintiff was cooperative, displayed an euthymic
mood intact memory, and intact thought process, and was noted to have adequate concentration
as well. R. at 43. The ALJ further noted that Plaintiff was able to adequately answer questions
of the ALJ and of her own counsel during the November 18, 2015 hearing. R. at 43 (citing R. at
66-94). Lastly, the ALJ found Plaintiff had no repeated episodes of decompensation for an
extended duration, or a of a residual disease process of such severity that even a minimal
increase in mental demands would be expected to result in decompensation, and there was no
evidence of an inability to function in the absence of a highly supportive living arrangement or
an indication for a continued need for such an arrangement. R. at 43. In fact, the ALJ
specifically observed that Plaintiff sought no mental health treatment or hospital stays for her
mental impairments from 2003 to September of 2015, and since September 2015, had attended
only two therapy sessions in September 2015 and October 2015. R. at 43 (citing R. at 950-53
("Exhibit B45F")). Notably, the ALJ found that the record did not show that Plaintiff has a
complete inability to function outside her home. R. at 43.

The ALJ also noted that the record established that although Plaintiff lives with her adult
stepdaughter, she stays home alone when her stepdaughter is not home, and leaves her home to
drive herself to medical appointments and to run personal errands several times a week. R. at

70-71, 84-85.  Therefore, the ALJ found that Plaintiff's mental impairments did not satisfy the "paragraph C" criteria in the Listing for mental disorders.  R. at 43.

Then, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform less than the full range of light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b), subject to the following limitations: lifting and carrying from the waist to chest level, standing and walking four hours and sitting six hours in an eight hour work day, alternate between sitting and standing every fifteen to thirty minutes to change positions for a few minutes for comfort, avoid crawling, kneeling, and climbing ropes, ladders, and scaffolds, but able to perform other postural movements on an occasional basis, limited to simple, routine, low stress tasks (defined as tasks involving minimal changes in the routine and avoids fast-paced work such as assembly line jobs and production quotas), limited to occasional, brief,  and superficial interaction with the public coworkers, and supervisors, and avoid concentrated exposure to respiratory irritants, extreme temperatures, and humidity, and also avoid working around hazards such as moving dangerous machinery and unprotected heights.  R. at 44.

The ALJ performed a credibility analysis, noting that although the evidence supported the existence of medically determinable impairments that would reasonably be expected to result in Plaintiff's reported symptoms (including "fatigue, concentration delays, joint pain, neck pain, and difficulty interacting with others"), based on the examinations, conservative nature of Plaintiff's treatment, the information contained in the provider progress notes, the hearing testimony, and the function reports submitted by Plaintiff, the record did not support the degree of limitation Plaintiff alleged.  R. at 48-49.  The ALJ also identified other factors that made Plaintiff's allegations "less than credible," including the fact that Plaintiff stated that she was

22

filing for disability because of her left Achilles tendon rupture and "for other reasons," and noted that, based on her employer's record, Plaintiff had indicated and that she was not interested in her job. R. 49-50. This led the ALJ to conclude that Plaintiff's statement that there were "other reasons" for leaving her job suggested that her unemployment "may be attributed to other causes than her health." R. at 50. Additionally, the ALJ determined that Plaintiff's Achilles tendon was repaired and did not prevent her from performing work within the established RFC for a period of twelve continuous months thereafter. Furthermore, regarding Plaintiff's alleged need for a cane, the ALJ found no medical recommendation for a cane, or any evidence that a medical provider prescribed such, and indeed, Plaintiff's ability to ambulate effectively without the use of a cane was well-documented. R. at 50. *See also* R. at 683 (Dr. Dulai observing on November 15, 2013, that Plaintiff "does not require an assistive device"). The ALJ also found significant the fact that "though [Plaintiff] alleged disabling depression and anxiety, she failed to continue mental health treatment, which suggests that her impairments were not as severe as alleged." R. at 49. Ultimately, the ALJ concluded that "various treatment modalities have ameliorated [Plaintiff's] symptoms," and "objective medical [evidence] supports a finding that [Plaintiff's] impairments were managed with conservative treatment." R. at 49.

In assessing the credibility of medical source opinions, the ALJ gave 'little weight" to the opinion of Dr. Snider, Plaintiff's treating neurologist, that Plaintiff could not work on a full time basis due to nocturnal seizures, because such a recommendation went to the ultimate decision of disability which is reserved to the Commissioner. R. at 50. This credibility determination of Dr. Snider was further buttressed by the fact that despite Plaintiff's complaints of excessive daytime fatigue and migraines, Plaintiff exhibited normal mood, affect, judgment, attention, and

concentration, and consistently normal EEG findings.  R. at 50.  Additionally, the ALJ afforded "little weight" to statements of Plaintiff's other treating doctors who assessed her with temporary limitations after she underwent surgery or experienced joint pain because such opinions "are impliedly temporary restrictions not intended to limit [Plaintiff] for more than a short period of time. . . . As temporary restrictions, the opinions do not render complete statements as to [Plaintiff's] condition throughout the relevant period of alleged disability."  R. at 50-51.  The ALJ gave the opinions of state agency examiners Dr. Vinh and Dr. Staehr (namely, that Plaintiff could perform light work subject to some limitations) significant weight because the record showed that despite alleging joint pain, Plaintiff had normal physical examinations, demonstrated a normal gait, and was able to climb the stairs in her home on a daily basis.  R. at 51.  *See also* R. at 101-14 ("Exhibit B1A"), *id.* at 116-32 ("Exhibit B3A").

Fourth, the ALJ determined that Plaintiff was unable to perform any past relevant work (as an aide to the intellectually disabled and a supervisor of aides) as those positions were medium/skilled and light/skilled work as performed in the national economy, and therefore were beyond her RFC, which precludes the performance of "skilled" work and work requiring anything beyond light work with limitations.  R. at 52 (citing 20 C.F.R. § 404.1565).  Regardless, the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform, and thus, she was not under disability during the relevant time period.  R. at 52-54.  The ALJ also noted that as of the alleged disability date, Plaintiff was thirty-nine years old, and considered a "younger individual."  R. at 52.  Plaintiff also has a high school education and is able to communicate in English.  R. at 52 (citing 20 C.F.R. §§ 404.1564 and 416.963).

Lastly, the ALJ found that considering her age, education, work experience, and RFC, as well as the anecdotal experience of the VE, there are jobs such as an office helper, clerical checker, mail clerk, office clerk, electronic inspector, and sorter that exist in significant numbers in the national economy that Plaintiff could perform. R. at 53-54 (citing R. at 158-59 ("Exhibit B10B"). Therefore, the ALJ determined that Plaintiff was not under a disability from October 5, 2012, through December 29, 2015, the date of the ALJ's decision. R. at 54.

## IV.  <u>STANDARD OF REVIEW</u>

Under the Social Security Act, the Court's review of the Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

In determining whether the Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).  If "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for the decision falls on the [Commissioner] (or the [Commissioner's] delegate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).  Accordingly, if the Commissioner's denial of benefits is supported by substantial

evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V. ANALYSIS

### A. The ALJ sufficiently accounted for moderate limitations in Plaintiff's concentration, persistence, and pace as required by *Mascio*.

Plaintiff argues that the ALJ did not sufficiently account for the moderate limitations in Plaintiff's concentration, persistence, and pace as required by *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015). In *Mascio*, the Fourth Circuit joined other circuits in finding that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *See Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015) (observing that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace") (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011) (joining the Third, Seventh, and Eighth Circuits)). The Commissioner contends that the ALJ did sufficiently account for such moderate limitations by restricting Plaintiff to low-stress, simple tasks, and avoiding any fast paced work. The undersigned agrees with the Commissioner.

Courts within the Fourth Circuit have found that an ALJ complies with *Mascio* by limiting claimants to non-production work or work not performed at an assembly-line pace, because these limitations account for a claimant's difficulty with staying on task. *See Baker v. Colvin*, No. 3:15-CV-00637 (HEH), 2016 WL 3581859, at *3 (E.D. Va. June 7, 2016), *report and recommendation adopted*, No. 3:15CV637-HEH, 2016 WL 3582071 (E.D. Va. June 28, 2016) (observing that "[n]umerous district courts have held that an RFC limiting an individual to

26

work in a non-production oriented environment properly addresses an individual's ability to stay on task") (citing *Eastwood v. Colvin*, 2016 WL 805709, at * 4 (E.D. Va. Feb. 12, 2016) (holding that a hypothetical limiting an individual to jobs not performed at assembly line pace adequately accounted for the plaintiff's limitations in concentration, persistence or pace); *Linares v. Colvin*, 2015 WL 4389533, at *4 (W.D.N.C. July 17, 2015) (holding that a hypothetical limiting an individual to "simple repetitive, routine tasks in a stable work environment at non-production *[sic]* pace with only occasional public contact" accounted for the plaintiff's ability to stay on task); *Massey v. Colvin*, 2015 WL 3827574, at *7 (M.D.N.C. June 19, 2015) (distinguishing *Mascio* on the grounds that the ALJ's hypothetical included that the individual should work a non-production oriented job and, thus, accounted for the Plaintiff's production pace)).

Accordingly, the undersigned **FINDS** that the ALJ properly accounted for Plaintiff's moderate limitations in concertation, persistence, and pace by limiting Plaintiff to positions with parameters that would allow her to remain on task during a full workday, and therefore, did not run afoul of *Mascio*.

## B. Plaintiff's additional evidence does not warrant remand.

Following the issuance of the ALJ's written decision on December 29, 2015, Plaintiff's counsel submitted additional evidence to the Appeals Council for consideration, including a neuropsychological assessment of Plaintiff completed by Dr. Hunter on or about May 21, 2015.[11]

---

[11] The undersigned notes that at the conclusion of the November 18, 2015 hearing, and pursuant to Plaintiff's counsel's request, the ALJ left the record open for ten days for Plaintiff's counsel to provide additional medical records from Dr. Hu Wang, a Sentara neurology specialist. R. at 67-68, 93. By letter dated November 24, 2015, Plaintiff's counsel requested a thirty day extension of time to complete submission of the evidence, but such letter failed to provide any rationale for why the extension was sought, other than that Plaintiff's counsel had not yet received the additional medical evidence. Plaintiff's counsel did not seek the hearing office's assistance in

*See* ECF No. 9 at 15 (citing R. at 1012-40). The Appeals Council denied Plaintiff's request for review, noting that Plaintiff's submission of additional evidence did not provide an adequate basis for altering the ALJ's decision. R. at 1-2. According to Plaintiff, this Court cannot determine whether substantial evidence supports the ALJ's decision because the Appeals Council "summarily denied review of the evidence" and failed to either make factual findings about the new evidence or to reconcile this new, additional evidence with the evidence already in the record before the ALJ. ECF No. 9 at 15 (citing *Meyer v. Astrue*, 662 F.3d 700 (4th Cir. 2011)). Plaintiff also contends that it would have been "helpful" if the Appeals Council explained why they were rejecting the new evidence, but recognizes that the governing regulations require no explanation to accompany such rejection. *See* ECF No. 9 at 14 (citing *Martinez v. Barnhart*, 444 F.3d 1201, 1207-08, 164 F. App'x 725 (10th Cir. 2006); *Damato v. Sullivan*, 945 F.2d 982, 988-89 (7th Cir. 1992) (noting that in "fairness to the party appealing the ALJ's decision, the Appeals Council should articulate its reasoning" when it rejects new material evidence and denies review)). *See also Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011) (observing that "nothing in the Social Security Act or regulations promulgated pursuant to it requires that the Appeals Council explain its rationale for denying review"). For reasons articulated herein, Plaintiff is incorrect.

It is well-established that if a claimant is "dissatisfied" with an ALJ decision as to entitlement to disability benefits, he or she "may request" that the Appeals Council review "that action." *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011) (citing 20 C.F.R. § 404.967). Where, as here, when a claimant requests review of an ALJ's decision by the Appeals Council,

---

expediting receipt of such records from the provider. Consequently, the ALJ issued his decision without the additional medical records. R. at 38.

the Appeals Council "may deny *or* dismiss the request for review, *or* it may grant the request and either issue a decision *or* remand the case to [the ALJ]." *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011) (citing 20 C.F.R. § 404.967) (italics and alteration in original).  As the *Meyer* Court explained,

> [t]he Appeals Council will grant a claimant's request for review rather than deny or dismiss the request if:
> > (1) There appears to be an abuse of discretion by the [ALJ];
> > (2) There is an error of law;
> > (3) The action, findings, or conclusions of the [ALJ] are not supported by substantial evidence; or
> > (4) There is a broad policy or procedural issue that may affect the general public interest.

*Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011) (citing 20 C.F.R. § 404.970(a)) (alterations in original).  Additionally, "[t]he regulations also specifically permit claimants to submit additional evidence, not before the ALJ, when requesting review by the Appeals Council."  *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011) (citing 20 C.F.R. §§ 404.968, 404.970(b)).  When considering a claimant's submissions, "the Appeals Council first determines if the submission constitutes 'new and material' evidence that 'relates to the period on or before the date of the [ALJ's] hearing decision." *Meyer v. Astrue*, 662 F.3d 700, 704-05 (4th Cir. 2011) (citing 20 C.F.R. § 404.970(b)).  "Evidence is new within the meaning of this section if it is not duplicative or cumulative."  *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.3d 93, 96 (4th Cir. 1991) (citing *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990); Associate Comm'r of Hearings and Appeals, Social Security Admin., Pub. No. 70–074, *Hearings, Appeals, Litigation, and Law (LEX) Manual*, § I–3–306(A) (1990)).  "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome."  *Wilkins v. Sec'y, Dep't of*

29

*Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (citing *Borders v. Heckler*, 777 F.2d 954, 956 (4th Cir. 1985)).   If the Appeals Council determines that the claimant's submitted evidence is new and material, "the Appeals Council then 'evaluate[s] the entire record including the new and material evidence.'" *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011) (citing 20 C.F.R. § 404.970(b)).   Upon completion of "this evaluation, if the Appeals Council finds that the ALJ's 'action, findings, or conclusion is contrary to the weight of the evidence currently of record' . . . it will grant the request for review and either issue its own decision on the merits or remand the case to the ALJ."   *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011) (citing 20 C.F.R. §§ 404.967, 404.977(a), 404.979).   "But if upon consideration of all of the evidence, including any new and material evidence, the Appeals Council finds the ALJ's action, findings, or conclusions not contrary to the weight of the evidence, the Appeals Council can simply deny the request for review." *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011).   Upon review by this Court, it is axiomatic that if, after considering the additional evidence, substantial evidence still supports the ALJ's decision, then remand is not warranted. *See Gainforth v. Colvin*, No. 2:15-CV-205, 2016 WL 3636840, at *9 (E.D. Va. May 9, 2016), *report and recommendation adopted*, No. 2:15CV205, 2016 WL 3636621 (E.D. Va. June 29, 2016).

Here, the weight of the objective and subjective evidence in the record supports the ALJ's determination that Plaintiff's neurocognitive impairments resulting from an alleged nocturnal seizure disorder do not appear to limit her ability to engage in fulltime, gainful employment.   Plaintiff's post-hearing submissions do not alter that conclusion.   This new evidence offered by Plaintiff is immaterial because the underlying facts and symptoms included in Dr. Hunter's report and highlighted by Plaintiff, "merely agreed with substantive evidence

already before the ALJ." *Gainforth v. Colvin*, No. 2:15-CV-205, 2016 WL 3636840, at *11 (E.D. Va. May 9, 2016), *report and recommendation adopted*, No. 2:15CV205, 2016 WL 3636621 (E.D. Va. June 29, 2016) (citing *Ahnen v. Colvin*, No. 3:14CV098 JRS, 2015 WL 868107, at *18 (E.D. Va. Feb. 27, 2015); *Bagbey v. Colvin*, No. 3:13CV298-HEH, 2014 WL 791871, at *10 (E.D. Va. Feb. 24, 2014) ("New evidence must be material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him.")). Such information was also cumulative because it simply reiterated information that was already before the ALJ by virtue of Dr. Snider's opinion. Remand is unnecessary where the only basis for remand is for the ALJ to consider information he previously reviewed (provided by Dr. Snider), yet from a different source (Dr. Hunter). Notably, Plaintiff identifies no new information from Dr. Hunter's report that was previously unavailable to or not discussed by the ALJ. Additionally, the undersigned notes that the additional evidence provided by Dr. Hunter's report actually reinforces the ALJ's finding that Plaintiff is not disabled. For example, with the exception of a mild weakness in her ability to recall visually presented information[12], Dr. Hunter concluded that Plaintiff exhibited a normal cognitive profile. R. at 1012. Additionally, upon examination of her mental status, Plaintiff was fully alert, attentive, and cooperative with a goal-directed thought process, average intellect, fair insight and judgment, and no hallucinations or suicidal thoughts, notwithstanding Dr. Hunter's observation that Plaintiff demonstrated an irritable mood and constricted affect. R. at 1015-16. Additionally, and particularly relevant to Plaintiff's alleged physical limitations, Dr. Hunter observed that Plaintiff arrived unaccompanied and on time for the scheduled interview, was "well nourished," and "ambulated independently,"

---

[12] However, Dr. Hunter observed that "[t]his was not her presenting complaint, and may have little clinical significance." R. at 1012.

with "unremarkable" posture and "good" grooming. R. at 1015.

Ultimately, after considering the evidence of record, which includes Plaintiff's post-hearing submission (and Dr. Hunter's report), the undersigned **FINDS** that remand is improper because despite the opinions contained in the post-hearing submission, substantial evidence supports the ALJ's decision that Plaintiff is not disabled. *Gainforth v. Colvin*, No. 2:15-CV-205, 2016 WL 3636840, at *9 (E.D. Va. May 9, 2016), *report and recommendation adopted*, No. 2:15CV205, 2016 WL 3636621 (E.D. Va. June 29, 2016).

**C. The ALJ properly discounted the credibility of Plaintiff's treating physician.**

Plaintiff contends that the ALJ erred by giving little weight to the opinion of her treating physician, Dr. Snider. *See* ECF No. 9 at 19 ("The ALJ failed to provide a sufficient explanation as to why he rejected Dr. Snider's opinion."). For reasons discussed herein, the undersigned disagrees.

The pertinent regulations determine the weight that shall be afforded to medical opinions when considering a claimant's disability application. For example, "[u]nder the 'treating physician rule,' a treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical evidence and not inconsistent with other substantial evidence of record." *Thompson v. Astrue*, 442 F. App'x 804, 808 (4th Cir. 2011) (citing 20 C.F.R §§ 404.1527(d)(2), 416.927(d)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001)). "However, 'if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.'" *Thompson v. Astrue*, 442 F. App'x 804, 808 (4th Cir. 2011) (quoting *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996); 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4)).

Here, Dr. Snider is a "treating physician" of Plaintiff.  *See* R. at 804 (Dr. Snider documenting treatment of Plaintiff as beginning on June 1, 2009 and continuing through current date – May 5, 2014).  As discussed by the ALJ's written decision, the ALJ afforded little weight to Dr. Snider's opinion, namely, that Plaintiff was impaired in her ability to maintain a regular employment schedule, complete tasks in a customary production schedule, and that Plaintiff was unable to concentrate in a work setting or to regularly complete a full, eight hour workday due to fatigue resulting from Plaintiff's nocturnal seizures. R. at 50.  The Commissioner argues that the ALJ correctly rejected Dr. Snider's opinion that Plaintiff is incapable of fulltime employment, for several reasons, not least of all, because such a determination of the ultimate issue rests exclusively within the province of the Commissioner.  ECF No. 11 at 24.  *See also Thompson v. Astrue,* 442 F. App'x 804, 808 (4th Cir. 2011) ("Dr. Hughes simply opined in his conclusory fashion that Thompson was 'permanently and totally disabled' and 'will never be able to perform substantial gainful work activity.' Thus, Dr. Hughes' letter more closely resembled an opinion on a matter reserved to the Commissioner than a medical opinion. . . . Such opinions are not afforded any special significance.") (citing  20 C.F.R. §§ 404.1527(e), 416.927(e) ("Opinions on some issues . . .  are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case.")).

The undersigned **FINDS** that the ALJ properly discounted Dr. Snider's opinion, notwithstanding his status as a treating physician because such opinion was plainly contradicted by the substantial evidence in the record, as explained herein.

First, this opinion was not well-supported by the objective medical evidence in the record because Plaintiff consistently had essentially normal EEG and MRI studies. *See, e.g.,* R. at 504,

517, 526-28, 925-26. *See also* R. at 50 (ALJ noting the consistently normal EEG findings in his written decision).

Second, Dr. Snider's opinion (dated June 11, 2014) was contradicted by the subsequent findings of Plaintiff's primary care physician, neuropsychologist, and her therapist, as well as self-reports of Plaintiff herself. Following a psychiatric evaluation and follow-up for depression on August 6, 2015, Plaintiff's primary care physician noted that Plaintiff's mood, memory, affect, and judgment were normal. R. at 1006. On September 28, 2015, Plaintiff's therapist noted that Plaintiff demonstrated full orientation with normal concentration, normal memory, goal-directed thought processes, average intelligence, and no hallucinations or preoccupations. R. at 952. In fact, on July 7, 2015, Plaintiff specifically reported to Dr. Snider that despite her alleged chronic fatigue, she had no trouble with completing errands alone, or making decisions, or difficulty with remembering. R. at 663-64, 958. Additionally, during a May 21, 2015 Neuropsychological Assessment performed by Dr. Hunter, Plaintiff reported that she was "self-sufficient in all IALDS [instrumental activities of daily living]." R. at 1015.

Third, as compared to the consultative examiner, Dr. Dulai, and the state agency examiners, Drs. Vinh and Staehr, Dr. Snider's opinion was an outlier. Dr. Dulai, a neurologist, personally examined Plaintiff and concluded that she could work in a position that allowed for standing and walking for four hours during an eight hour work day, with no limitations for sitting or limitations due to Plaintiff's pseudo-seizures. R. at 682-83. Dr. Vinh and Dr. Staehr both independently reviewed Plaintiff's medical records and reached the same conclusions: that Plaintiff could perform a limited range of light work, with Dr. Staehr accounting for Plaintiff's pseudo-seizures with the limitation that Plaintiff avoids concentrated exposure to extreme heat

and moderate exposure to hazards. R. at 111, 128-29.

Finally, and most significantly, Dr. Snider's own records of Plaintiff's care do not support the degree of limitation he assessed Plaintiff as having, and this June 11, 2014 opinion was formed in (partial) reliance on old studies from 2007 and 2008 that were not even performed by Dr. Snider himself. *See* R. at 804 (listing "reports of sleep studies from Dr. Trent Davis (Kansas) from 9/6/2007 and 12/22/2008" when asked to identify clinical observations, findings and test results supporting Dr. Snider's diagnoses of Plaintiff). While Dr. Snider assessed Plaintiff with an extreme degree of limitations, Dr. Snider's treatment records are devoid of substantive complaints that would support such an opinion. A review of Dr. Snider's treatment records indicates that Plaintiff subjectively complained about nocturnal seizures and possible epilepsy, but there is no objective, clinical evidence of such. As the Commissioner notes, "[t]he fact that Dr. Snider merely recorded Plaintiff's subjective complaints concerning her symptoms is not compelling clinical evidence supporting his assessment." ECF No. 11 at 26 (citing *Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996) ("Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers . . ."). Additionally, at Plaintiff's last visit with Dr. Snider on July 7, 2015, Dr. Snider stated "[w]e discussed various options. It appears that Dr. Huang [sic][13] would be best equipped to manage the patient with this situation, as she has already put her up to [sic] a clinical

---

[13] In this Progress Note, Dr. Snider repeatedly refers to fellow neurologist Dr. Hua Wang as "Dr. Huang." *See* R. at 958-59.

psychologist. I will be available to see the patient on an as needed basis." R. at 959.

**D.    The ALJ correctly concluded that Plaintiff did not satisfy the seizure listing requirements.**

Plaintiff argues that the ALJ erred when it failed to give appropriate weight to Plaintiff's self-completed seizure diary, and if the ALJ had properly credited such diary entries, would have found that Plaintiff met seizure listing 11.02 (convulsive epilepsy).[14] ECF No. 9 at 20-24. The frequency of these nocturnal seizures as documented in the seizure diary is greater than the frequency found by the ALJ, a disparity left unexplained by the ALJ, thus Plaintiff concludes that the ALJ erred by ignoring such evidence. ECF No. 9 at 21-24. The Commissioner contends that the ALJ did not err because Plaintiff has never been formally diagnosed with epilepsy, and therefore could not have met either listing 11.02 (convulsive epilepsy) or listing 11.03 (non-convulsive epilepsy). ECF No. 11 at 27 ("She does not meet Listing 11.02 (convulsive *epilepsy*) or Listing 11.03 (non-convulsive *epilepsy*) because she is not epileptic") (citing R. at 926, 958-59) (emphasis in original).[15]  *See also Dixon v. Comm'r of Soc. Sec. Admin.*, No. 3:11-CV-482, 2012 WL 2826970, at *6 (N.D. Ohio July 10, 2012) ("Thus, Plaintiff's diagnosis of non-epileptic spells not only precluded her from meeting Listing 11.02 and 11.03, but also reasonably precluded her from medically equaling either listing also."); *Coleman v. Astrue*, No. 3:05-0389, 2010 WL 28567, at *13 (M.D. Tenn. Jan. 5, 2010) ("Given that the plaintiff's seizure episodes

---

[14] Plaintiff also references listing 11.03 (non-convulsive epilepsy), but does not argue which one should apply.

[15] The Commissioner also directs the Court's attention to the fact that the current version of the pertinent Listings, revised after the ALJ's December 29, 2015 decision, revised Listing 11.02 and eliminated Listing 11.03, and specifically disavows pseudo-seizures.  *See* ECF No. 11 at 28 n.4 ("The current version of the Listings omits Listing 11.03 and includes a revised Listing 11.02, which is defined as '[e]pilepsy, documented by a detailed description of a typical seizure and characterized by' one of four specific types of epileptic seizures, including generalized tonic-clonic seizures and dyscognitive seizures.").  *See also* 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 11.00(H) (Sept. 29, 2016) ("[P]sychogenic non-epileptic seizures and pseudo-seizures are not epileptic seizures for the purpose of [Listing] 11.02.").  The undersigned notes that Plaintiff does not address this Listings revision in her Reply, nor does she suggest that some other Listing applied to Plaintiff's pseudo-seizures. *See* ECF No. 12, *passim*.

were not determined to be epileptic in nature, the ALJ was effectively precluded from applying Listings 11.02 and 11.03 since those listings deal with disability requirements specific to convulsive and nonconvulsive epilepsy.").

The undersigned agrees with the Commissioner, and **FINDS** that substantial evidence clearly supports this conclusion. For example, both of Plaintiff's treating neurologists, Dr. Wang and Dr. Snider documented Plaintiff's self-reported nocturnal seizures as "pseudo-seizures," or "non-epileptic events," R. at 926, 958-59 (Dr. Snider describing Plaintiff's diagnosis as "non-epileptic convulsions"), as did her therapist, Ms. Simms, R. at 951 (describing physical health issues as including "Psychogenic Non-epileptic Seizure disorder").[16] Additionally, on August 28, 2015, during a pre-operative consult (before surgery to treat Plaintiff's Eagle Syndrome), Plaintiff reported to Dr. Sinacori that "the seizures are actually psuedoseizures." R. at 934. As the ALJ explained, Plaintiff's psuedoseizures were "noted to be attributed to her anxiety, and her doctors opined that [she] needed psychological treatment and only required observation from a neurologist on an as needed basis," and despite these professional opinions, Plaintiff failed to continue her mental health treatment and was noncompliant with her prescribed medication. R. at 49.

Accordingly, Plaintiff's reliance on *Rebrook v. Astrue*, No. 1:09cv50, 2010 U.S. Dist. LEXIS 54252, 2010 WL 2233672 (N.D.W. Va. May 14, 2010), *adopted by* 2010 U.S. Dist. LEXIS 54242, 2010 U.S. Dist. LEXIS 54242, 2010 WL 2292668 (N.D.W. Va. June 3, 2010) is

---

[16] *See Coleman v. Astrue*, No. 3:05-0389, 2010 WL 28567, at *12 (M.D. Tenn. Jan. 5, 2010) ("According to *Dorland's Illustrated Medical Dictionary*, psychogenic seizures are also called pseudoseizures and are defined as being 'attack[s] resembling an epileptic seizure but having purely psychological causes; [they] lack the electroencephalographic characteristics of epilepsy and the patient may be able to stop [them] by an act of will.'") (quoting Dorland's Illustrated Medical Dictionary 1536, 1676 (30th ed. 2003) (alterations in original).

misplaced.  *See* ECF No. 12 at 6 (explaining that in *Rebrook*, "the plaintiff had a combination of seizures and pseudoseizures,[and] the court reversed the ALJ's conclusion that her impairment was not properly evaluated under Listings 11.02 and 11.03, but rather should be considered a somatoform disorder under Listing 12.07").  Unlike the factual background of the instant case, in *Rebrook*, the court noted that the claimant had both seizure and pseudo-seizures, and the ALJ's reference to and apparent reliance solely on the claimant's pseudo-seizures was erroneous.  The *Rebrook* Court found that the presence of actual seizures was determinative of the fact that Listings 11.02 and 11.03 should have been analyzed by the ALJ.  Additionally, in *Rebrook*, the Court found that despite an explicit remand directive,

> [the ALJ] continued to improperly use the lack of a positive EEG, CT or MRI as evidence supporting denial of Plaintiff's claim. He also did not discuss whether Plaintiff's impairments, alone or in combination, may have equaled any listing. The ALJ also did not comply with this Court's remand order to evaluate Plaintiff's impairments using the revised listings.

*Rebrook v. Astrue*, No. 1:09CV50, 2010 WL 2233672, at *20 (N.D.W. Va. May 14, 2010), *report and recommendation adopted*, No. 1:09CV50, 2010 WL 2292668 (N.D.W. Va. June 3, 2010) (noting that effective May 24 2002, Listing 11.02 and 11.03 no longer required "an EEG be part of the documentation needed to support the presence of epilepsy") (quoting Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20,018, 20,019 (April 24, 2002) (to be codified at 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 11.02, 11.03); citing *Boiles v. Barnhart*, 395 F.3d 421, 425-27 (7th Cir. 2005) (finding that the ALJ improperly used a lack of a positive EEG as support for his decision and also failed to explain how other evidence in the record contradicted the treating physician's opinion about the frequency of the claimant's pseudo-seizures)).

The undersigned further notes that Plaintiff's reliance on the Seizure Diary Entries is contradicted by her medical records. For example, on June 12, 2014 at an appointment with Dr. Dixit, Plaintiff "denied seizure." R. at 902. Similarly, at a July 24, 2014 appointment with Dr. Dixit, Plaintiff again "denied "seizure." R. at 896. Plaintiff similarly denied seizures with Dr. Dixit on October 24, 2014, R. at 892, on December 1, 2014, R. at 891, on February 20, 2015, R. at 888, and again on August 11, 2015, R. at 884. Plaintiff also denied seizures upon July 6, 2015 examination by ear, nose, and throat specialist Dr. Kuhn, despite providing a patient history that included being "followed by neurology (Drs. Schneider [sic] and Wang) for seizure disorder. R. at 874. On July 30, 2015, Plaintiff again denied seizures to Dr. Kuhn. R. at 868. *But see* R. at 333-37 (Seizure Diary Entries indicating self-reported seizures occurred within days of Plaintiff's visits with Drs. Dixit and Kuhn). In sum, the ALJ's determination that Plaintiff did not meet or medically equal Listing 11.02 or 11.03 due to her nocturnal pseudo-seizures was supported by substantial evidence.

The undersigned **FINDS** that substantial evidence supports the ALJ's conclusions. Therefore, the undersigned **RECOMMENDS** Plaintiff's Motion for Summary Judgment be **DENIED** as to Plaintiff's claims of error. *See Fuller v. Astrue*, No. 8:11-CV-02854-TLW, 2012 WL 7548727, at *2 (D.S.C. Dec. 18, 2012), *report and recommendation adopted*, No. CIV.A. 8:11-02854, 2013 WL 708873 (D.S.C. Feb. 25, 2013) ("Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence.") (citing *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962)).

## VI. <u>RECOMMENDATION</u>

For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 8, be **DENIED**, the Commissioner's Motion for Summary Judgment, ECF No. 10, be **GRANTED**, and the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## VII. <u>REVIEW PROCEDURE</u>

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is forwarded to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a) plus three days permitted by Federal Rule of Civil Procedure Rule 6(d). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2. A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to the counsel of record for Plaintiff and the Commissioner.

LAWRENCE R. LEONARD
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
May 17, 2018

41