IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

KATINA CROWDER,

      **Plaintiff**

    v.

NANCY A. BERRYHILL,

      Civil No. 2:17-CV-186

      **Acting Commissioner,**
      **Social Security**
      **Administration,**
      **Defendant.**

## ORDER

This matter comes before the Court on Katina Crowder's ("Plaintiff") Objections to Magistrate Judge Lawrence R. Leonard's Report and Recommendation ("R&R"). For the reasons herein, the Court: (1) **ACCEPTS** the R&R, ECF No. 13; (2) **AFFIRMS** the decision of the Commissioner of the Social Security Administration ("Defendant"); (3) **DENIES** Plaintiff's Motion for Summary Judgment, ECF Nos. 8, 9; and (4) **GRANTS** Defendant's Motion for Summary Judgment. ECF No. 10.

## Contents

I.    PROCEDURAL BACKGROUND ........................................................................2

II.   FACTUAL BACKGROUND ...........................................................................3

    A.   PLAINTIFF'S BACKGROUND ................................................................3

    B.   MEDICAL HISTORY ...........................................................................4

    C.   ALJ HEARING – NOVEMBER 18, 2015................................................11

    D.   ALJ'S FINDINGS OF FACTS AND CONCLUSIONS OF LAW.....................13

III.  STANDARD OF REVIEW ...........................................................................15

IV.  ANALYSIS ..............................................................................................17

    A.   OBJECTION ONE: THE MAGISTRATE JUDGE ERRED IN FINDING THAT
       THE ADMINISTRATIVE LAW JUDGE'S ASSESSMENT OF PLAINTIFF'S

       RESIDUAL FUNCTIONAL CAPACITY COMPLIES WITH *MASCIO V. COLVIN*, 780 F.3D 632 (4TH CIR. 2015). ....................................................................18

**B.**    **OBJECTION TWO: THE MAGISTRATE JUDGE ACCEPTANCE OF THE ALJ'S DISCREDITING OF THE OPINION OF THE TREATING PHYSICIAN IS CONTRARY TO *LEWIS V. BERRYHILL*, 858 F.3D 858 (4TH CIR. 2017). ...................19**

**V.**    **CONCLUSION** ........................................................................................21

## I.    PROCEDURAL BACKGROUND

Plaintiff applied for Disability Insurance Benefits ("DIB") on or about October 15, 2012, and supplemental social security income ("SSI") on September 9, 2014, alleging disability as of October 5, 2012 due to seizure disorder, ruptured Achilles tendon, osteoarthritis, obesity, bone degeneration, and vitamin D deficiency. R. 38, 180-194, 248.[1]  The Commissioner denied Plaintiff's application at the initial level on November 21, 2013, and again upon reconsideration on April 17, 2014. R. 38, 134-38, 140-42. A hearing was held before an Administrative Law Judge (ALJ) on November 18, 2015. R. 38, 63-94. That day, Plaintiff, who appeared with counsel ("Plaintiff's counsel"), and an impartial vocational expert ("the VE") testified before the ALJ. R. 63-94.

On December 29, 2015, the ALJ issued a written decision denying Plaintiff's application and finding that Plaintiff was not disabled. R. 38-54. Plaintiff timely requested reconsideration, but the Appeals Council denied Plaintiff's request for review, making the ALJ's hearing decision the final decision of the Commissioner for purposes of judicial review.  R. 1-4. <u>See</u> 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481 (2018).

Pursuant to 42 U.S.C. § 405(g), Plaintiff timely filed her Complaint for judicial review of the Commissioner's final decision on April 4, 2017. ECF No. 1. Plaintiff filed her Motion for Summary Judgment on August 14, 2017. ECF No. 8. Defendant filed her Motion for Summary

---

[1] Page citations are to the Certified Administrative Record filed under seal on July 11, 2017. ECF No. 6.

Judgment on September 13, 2017. ECF No. 10. The matter was then referred to United States Magistrate Judge Lawrence R. Leonard pursuant to: (1) 28 U.S.C. § 636(b)(1)(B) and (C); (2) Rule 72(b) of the Federal Rules of Civil Procedure; (3) Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia, and (4) the April 2, 2002, Standing Order on Assignment of Certain Matters to United States Magistrate Judges. Magistrate Judge Leonard issued his R&R with respect to the parties' opposing motions on May 18, 2018. ECF No. 13. The R&R recommends that this Court DENY Plaintiff's Motion for Summary Judgment, AFFIRM the final decision of Nancy A. Berryhill, the Acting Commissioner of the Social Security Administration, and GRANT the Commissioner's Motion for Summary Judgment. Id. Plaintiff filed her objections to the R&R on May 30, 2018. ECF No. 14. Defendant filed her Response to Plaintiff's Objections on June 11, 2018. ECF No. 15.

## II.    FACTUAL BACKGROUND

### A. Plaintiff's Background

Plaintiff was born on April 13, 1973 and was 39 years old on her alleged disability onset date. R. 101. Plaintiff has a high school education and a certificate in child psychology. R. 72. Her past relevant work experience includes working for three different companies (Community Support Training, Just People, and Volunteers of America) as an aide for persons with intellectual disabilities and as a supervisor for other aides. R. 73-76. In Plaintiff's roles with Community Support Training and Just People, she served as a full-time supervisor. R. 74-76. Plaintiff's full-time employment as a supervisor with Just People ceased in January 2011. R. 74. Plaintiff was most recently employed on a per diem basis with Volunteers of America as a direct support professional. R. 73-77. Plaintiff's employment at Volunteers of America continued from approximately April 2011 to October 2012, followed by a brief return from June 2013 to sometime in summer 2013. R. 77-78.

3

### B. Medical History

Plaintiff's medical history is separated into different categories due to the varying nature of her medical issues.

#### 1. Mental Health

Dr. Salvador A. Arella ("Dr. Arella") opined in May 2003 that Plaintiff suffered from major depression, anxiety disorder not otherwise specified, and PTSD. R. 346 ("Exhibit B1F"). In 2015, Plaintiff sought mental health treatment from Kashina Simms, LCSW ("Ms. Simms") at the recommendation of her treating neuropsychologist. See R. at 1019 ("She is amenable to psychotherapy."). Plaintiff only attended two therapy sessions with Ms. Simms in September and October 2015. R. 950-53 ("Exhibit B45F").

#### 2. Emergency Department/Patient First

There are significant lapses in health insurance coverage in Plaintiff's medical history. During these lapses, Plaintiff utilized the services of various clinics and emergency rooms for treatment of issues such as shortness of breath, chest pain, facial swelling, and throat pain/swollen lymph nodes. See, e.g., R 444-47 ("Exhibit B10F" – Patient First); id. 606-18 ("Exhibit B28F" – Chesapeake Regional Medical Center Emergency Department); id. 783-87 ("Exhibit B33F" – Sentara Urgent Care); id. 837-38 ("Exhibit B38F" – Patient First).

#### 3. Rheumatology

In the fall of 2010, Dr. Brinda Dixit ("Dr. Dixit") began treating Plaintiff for her rheumatoid arthritis, osteoarthritis, and mixed connective tissue disease. R. 301, 353-81 ("Exhibit B4F"). Plaintiff was unable to continue seeing Dr. Dixit after her visit on May 20, 2011, however, because she lost her health insurance. R. 900. From November 8, 2011 to March 2012, Plaintiff's rheumatoid arthritis was treated by Dr. Janice Sherwood ("Dr. Sherwood") of Arthritis Consultants of Tidewater. R. 426-41 ("Exhibit B9F").

On June 12, 2014, Plaintiff saw Dr. Dixit again and complained of joint pain all over her body with "more pain and flares in the summer v. the winter." R. 900. Due to her complaints of joint pain and pursuant to Dr. Dixit's referral, Plaintiff had a bone scan on June 20, 2014. The results of the June 2014 bone scan were documented as "[f]indings consistent with multifocal arthropathy, unchanged compared to 3/7/11." R. 904. See also R. 595 (March 7, 2011 bone scan results). Plaintiff returned to Dr. Dixit on July 24, 2014 to discuss the findings of the bone scan. At this time she also reported pain in her hands, shoulders, and knees, but "less pain, less stiffness and joint swelling since on Plaquenil." R. 896. Plaintiff also reported "no side effects." Id. Three months later, on October 24, 2014, Plaintiff saw Dr. Dixit for a follow-up appointment, at which appointment she complained of pain in her lower back, knees, and toes, as well as pain flares in her wrists, hands, and thumbs. R. 892. Dr. Dixit directed Plaintiff to continue on normal medication and to schedule a follow-up in four to six weeks. R. 894. On December 1, 2014, Plaintiff saw Dr. Dixit and displayed a normal gait. R. 890. Plaintiff also reported that her rheumatoid arthritis ("RA") was active and that she felt "uncomfortable with the RA meds and she [did] not want to take anything at this time." R. 890. On conclusion of her December 1, 2014 visit, Plaintiff indicated that she would restart taking Plaquenil (her current RA medication) and "think about starting" to take Sulfasazine ("SSA"), a class of drugs used to treat some autoimmune diseases that can help reduce joint pain and inflammation. R. 890.

On February 20, 2015, Plaintiff again returned to Dr. Dixit reporting pain in her ankles, wrists, and knees, which she attributed to the cold weather. R. 886. During this visit, Plaintiff admitted that she never started taking the SSA "because she was afraid of the side effects that might occur." R. 886.

Dr. Dixit noted that the Plaintiff:

> is noncompliant and we have discussed this in detail. She states she is afraid of taking the sulfasalazine and other meds. She feels comfortable with the Plaquenil. She does not want to take other meds at this time. **She states that she understands that it is her fault and that she just does not want to take more meds, and she will continue to have pain and inflammation.**

R. 887 (emphasis added). Dr. Dixit directed Plaintiff to have a follow-up visit in six months, which occurred on August 11, 2015. R. 882, 888. During this visit, Plaintiff reported that although she was experiencing neck, shoulder, and knee pain, she "[o]therwise feels that Plaquenil is helping her hands/feet swelling, pain[,] and some of her fatigue." R. 882. Again, Plaintiff reported that she had no side effects. Id.

      4.    <u>Primary Care Physician/Asthma</u>

Dr. Robert Bademian ("Dr. Bademian") is Plaintiff's Primary Care Physician and manages treatment of Plaintiff's asthma. R. 960-65. In an April 24, 2014 Progress Note by Dr. Bademian, he indicated that Plaintiff's asthma was "worse this spring with needing albuterol." R. 961. Dr. Bademian continued to treat Plaintiff's asthma with an albuterol inhaler. R. 964. During a visit with Plaintiff on May 1, 2014, Dr. Bademian observed that Plaintiff's lungs were "clear" and she was continued on the previous asthma treatment plan. R. 967-68, 970.

On May 21, 2014, Plaintiff saw Dr. Bademian for a follow-up after being diagnosed with pneumonia, but Dr. Bademian once again observed Plaintiff's lungs to be "clear" and directed that she continue to follow the current treatment plain. R. 973-76.

During a follow-up visit with Dr. Bademian for her asthma on August 22, 2014, Plaintiff reported "[r]are albuterol use." R. 979-81. She was directed to continue with the existing treatment plan. Id.

Nearly six months later, on February 24, 2015, Plaintiff returned to Dr. Bademian for an

asthma follow-up and reported that she "[h]as had more wheezing despite singulair with colder weather past 3 months," that she was using albuterol about twice a day, and that she had "[n]o cough or doe [dyspnea on exertion]".[2]  R. 984.  At the conclusion of this visit, Dr. Bademian directed that Plaintiff continue the existing asthma treatment.  R. 986-987.  Dr. Bademian also noted that if the Plaintiff's asthma did "not improve with warmer weather," he would add an inhaled steroid.  Id.

On June 25, 2015, Plaintiff had her next visit with Dr. Bademian.  However, Plaintiff had no complaints about her asthma.  Instead, the majority of her visit was spent discussing her depression.  R. 989-1002.  Plaintiff had a follow-up with Dr. Bademian regarding her depression on August 6, 2015, during which she reported "[n]o worsening depression" and Dr. Bademian noted that Plaintiff displayed normal mood, judgment, memory, and affect.  R. 1003-1006.  No mention of Plaintiff's asthma was made during this appointment.

### 5.  Allergy/Immunology

Plaintiff was diagnosed with cutaneous vasculitis on November 22, 2010 after an examination by allergist/immunologist Dr. Craig S. Koenig ("Dr. Keonig) pursuant to a referral from Dr. Sequita Morris ("Dr. Morris") to investigate the cause of Plaintiff's episodic facial swelling and rashes/hives.  R. 365-67.  Dr. Koenig recommended prophylactic use of an antihistamine (Zyrtec), and requested Plaintiff to follow-up with him.  R. 366.

### 6.  Ear, Nose, and Throat

On or about December 30, 2010, Plaintiff began seeing ear, nose, and throat specialist Dr. David Leonard ("Dr. Leonard") for treatment of and surgery for facial swelling, dysphagia, otalgia, and masses in her head/neck, and throat.  R. 301.  Dr. Leonard removed two benign

---

[2] Dyspnea on exertion or "exertional dyspnea" refers to shortness of breath experienced upon mild exertion such as walking up stairs.

masses from Plaintiff's throat on or about September 20, 2013. R. 688, 620-22.

In July 2015, ear, nose, and throat specialist Dr. Jeffrey Kuhn ("Dr. Kuhn") examined Plaintiff for ear, throat, and shoulder pain. Upon examining Plaintiff and obtaining CT scans, Dr. Kuhn diagnosed Plaintiff with "Eagle's Syndrome." R. 844-51.

On August 28, 2015, otolaryngologist Dr. John T. Sinacori ("Dr. Sinacori") performed surgery on Plaintiff to correct an elongated styloid process (calcified stylohyoid ligament), in order to alleviate Plaintiff's recurrent facial/neck pain and migraines. When Plaintiff emerged from anesthesia, she was observed to exhibit "pseudo-seizure like activity" and was admitted for overnight observation. R. 840-41. However, Plaintiff "did not have any further seizure like activity overnight." R. 840-41. As such, she was discharged the next day. Id.

### 7. Orthopedics

On September 23, 2012, Plaintiff was seen at Patient First for heel pain she experienced after she "was at church jumping up and down in the aisles during praising." R. 447. Plaintiff "[s]omehow misstepped [sic] and...had discomfort ever since then in back of heel." Id. Plaintiff experienced "a lot of pain with weight bearing." Id. A small heel spur was observed upon x-ray examination. Id.

Approximately one week later, on October 1, 2012, Plaintiff presented to the Sentara Princess Anne Hospital Emergency Department with a complaint of "left ankle pain from a fall a week ago at church." R. 475. Plaintiff stated that she "was shouting and praising the Lord, and [she] fell." Id. Plaintiff was "unable to ear weight and report[ed] increased pain." Id.

On the next day, October 2, 2012, Plaintiff began seeing orthopedic surgeon Dr. Lawrence Shall ("Dr. Shall") for treatment of her left Achilles Tendon. R. 301. On October 5, 2012, Plaintiff had her Achilles tendon repaired by Dr. Shall. R. 489. Once again, when

Plaintiff emerged from anesthesia, she exhibited "seizure-like symptoms" and was admitted to the ICU for observation. R. 480, 482. Plaintiff was submitted to an EEG on that same day (pursuant to a referral from Dr. Shall) due to a "change in mental status." R. 528. The conclusion was that the EEG was normal with "no focal slowing or epileptiform activities noted." Id. Plaintiff was cleared to be discharged by her treating neurologist, Dr. Gilbert M. Snider, on the next day. Id.

       8.   Neurology

On or about June 1, 2009, Plaintiff began seeing neurologist Dr. Gilbert M. Snider ("Dr. Snider") for an alleged nocturnal seizure disorder as well as migraines.[3] Plaintiff continued to see Dr. Snider until July 7, 2015, when he effectively transferred management of Plaintiff's care to neurologist Dr. Hua Wang ("Dr. Wang"). R. 302, 804, 959. During a visit with the Plaintiff on March 16, 2011, Dr. Snider noted that Plaintiff had not appeared for a follow-up from a February 2010 visit after missing or rescheduling appointments on July 28, 2010, August 31, 2010, September 1, 2010, December 1, 2010, and January 19, 2011. R. 523. At this same March 16, 2016 appointment, Dr. Snider stated that Plaintiff's "[m]ental status shows no evidence of anomia, apraxia, aphasia, paraphasic errors of speech, memory deficits." R. 523.

Approximately two weeks after Plaintiff filed her application for disability, on October 23, 2012, Plaintiff was directed by Dr. Snider to submit to a brain MRI due to "recent breakthrough seizures." R. 526. The test produced results that were described as "a relatively unremarkable MRI of the brain for patient's stated age." Id. About one year and one month later, on November 13, 2013, Plaintiff was seen by Dr. Snider "for followup [sic] and

---

[3] The R&R notes that Plaintiff provided April 2009 as the starting date of treatment with Dr. Snider in her appeal of the initial denial of benefits. This date is two months earlier than the June 2009 date provided by Dr. Snider in his medical source opinion. *Compare* R. 302 (Plaintiff's Appeal), *with* R. 804 (Dr. Snider's opinion). Magistrate Judge Leonard noted, however, that this discrepancy made no difference in his ultimate recommendation.

management of her seizure disorder." R. 663. It was noted that "recently, [Plaintiff] has had some breakthrough seizures." R. 663. Dr. Snider observed that Plaintiff was alert and oriented, "with no evidence of anomia, asphasia, parasphasic errors of speech or aprosodic speech." R. 664. Dr. Snider further noted that she had a normal gait and station. Id. At this time, based on Plaintiff's reports, her nocturnal seizures were "under poor control." Id. Dr. Snider noted that he was "limited to what [he could] prescribe for the [Plaintiff] by her inability to swallow pills and her daytime hypersomnolence."[4] Id. However, Dr. Snider slightly changed the dosage of Plaintiff's medication and the timing for administration in the hope that such changes would "keep her seizures under better control." Id.

On January 9, 2015, Dr. Snider referred Plaintiff to Dr. Wang to be evaluated for epilepsy surgery. R. 810. Pursuant to Dr. Wang's referral, on May 21, 2015, Plaintiff appeared for a Neuropsychological Assessment with neuropsychologist Dr. Melissa P. Hunter ("Dr. Hunter"). R. 1012-18. On June 9, 2015, Plaintiff saw Dr. Hunter again to discuss the impressions and results of the May 21, 2015 assessment. Dr. Hunter noted that Plaintiff "arrived as scheduled," was unaccompanied, "actively participated" in dialogue regarding the neuropsychological assessment results, "ambulate[d] independently, was "attentive and cooperative." R. 1019. Dr. Hunter further noted that Plaintiff was amenable to Dr. Hunter's suggested plan of psychotherapy and expressed a willingness to consider medicated management of her depression. Id.

### 9. Consultative Examination

On November 15, 2013, Dr. Sarbjot Dulai ("Dr. Dulai"), a state consultative examiner, conducted an examination of Plaintiff. R. 680-85. Plaintiff was observed to be "alert and

---

[4] Hypersomnolence is characterized by excessive daytime sleepiness.

oriented," "was cooperative and put forth her best effort throughout the examination," and presented with normal attention span and concentration. R. 682. Dr. Dulai took note of Plaintiff's self-reported history of depression in the past, but noted that Plaintiff was "[c]urrently on no medication." Id. Despite joint pain, back pain, left Achilles tendon pain, and nocturnal seizures, Plaintiff reported that she "can do all activities of daily living." R. 681. Dr. Dulai ultimately assessed Plaintiff as having no limitations with sitting, but found that she was limited to four hours of standing/walking in an eight-hour workday and limited to certain postural positions. R. 682. Plaintiff was also limited to frequently lifting ten pounds and occasionally lifting twenty pounds. R. 683.

          10.    State Agency Doctors

After Dr. Dulai performed a consultative examination of Plaintiff, two State agency doctors, Dr. Luc Vinh ("Dr. Vinh") and Dr. Patricia Staehr ("Dr. Saehr") also conducted assessments of Plaintiff's medical records on November 21, 2013 (Dr. Vinh) and on April 8, 2014 (Dr. Staehr).[5] R. 101-14 ("Exhibit B1A"), 116-32 ("Exhibit 3A"). Upon completion of their assessments, Dr. Vinh and Dr. Staehr concluded that Plaintiff could perform work at a light exertional level with some limitations, including frequently lifting/carrying ten pounds, occasionally lifting/carrying twenty pounds, standing/walking for four hours, sitting for six hours in an eight-hour workday, and avoiding concentrated exposure to extreme heat and even moderate exposure to hazards. R. 111, 128-29.

### C. ALJ Hearing – November 18, 2015

At the ALJ hearing, Plaintiff testified that she suffers on a daily basis from PTSD, anxiety, and depression. R. 83-85. Plaintiff further testified that the anxiety over her physical

---

[5] Dr. Staehr's assessment of Plaintiff was completed at the reconsideration level. *See* R. 116.

pain and nocturnal seizures creates stress and a lack of sleep, which in turn exacerbates her depression, anxiety, and PTSD. Id. Plaintiff also testified to a number of physical health issues including pain and fatigue due to nocturnal seizures as well as chronic pain in her joints, neck, shoulders, elbows, knees, ankle, and feet. R. 81. Plaintiff is allergic to most narcotic pain medication, which limits the relief she obtains from her pain. R. 81. Plaintiff testified that she typically has to lie down for approximately six hours out of an eight-hour day due to her fatigue and pain. R. 80-81. Lastly, Plaintiff testified that she was recently diagnosed with a "rare thing called Eagle syndrome where the ligaments...have calcified and over grown [sic] and so they are putting pressure on the nerves in these regions, which cause me to have increased headaches and neck and shoulder pain," but that she was supposed to have a second surgery to remove the calcified ligament. R. 82-83.

Plaintiff is prescribed morphine and sulfate to be taken every four to six hours, but she usually only takes it around bedtime because it makes her drowsy. R. 82. In addition, Plaintiff takes 800 milligram Motrin and is prescribed Valium for anxiety and as a muscle relaxant. Id. Plaintiff testified that she typically has to lie down for approximately six hours out of an eight-hour day due to her fatigue and pain. R. 80-81.

The vocational expert testified that a person of Plaintiff's age, education, work background, and certain limitations[6] would be unable to perform Plaintiff's past work. R. 90-91. However, such an individual could perform light or sedentary unskilled jobs such as an office

---

[6] The limitations provided were as follows: "limited to light work with the following limitations and can only lift and carry from waist to chest level, stand and walk about four hours within an eight hour work day, need the option to be able to sit or stand – sit or stand no longer than 15 to 30 minutes before having to alternate positions for a few minutes for comfort. Avoid climbing ladders, ropes, and scaffolds, crawling, and kneeling, perform other postural occasionally. Limited to simple, routine, low stress tasks. Low stress is defined as requires work involving minimal changes in the routine, avoid fast paced work, such as assembly line jobs involving production quotas. Is limited to occasional brief, superficial interaction with the public, coworkers, and supervisors. Avoid working around hazards, such as moving dangerous machinery and unprotected heights, avoid concentrated exposure to respiratory irritants, and extreme temperatures and humidity." R. 89-90.

helper, a clerical checker, a mail clerk, an office clerk, an electronics inspector, or a sorter. Id. Such positions would, in the VE's experience, allow such an individual to alternate between sitting and standing and do only four hours of standing and walking in an eight-hour work day. Id.

The vocational expert further testified that such an individual could perform the aforementioned positions if she needed to be absent from work once or twice a month due to fatigue, nocturnal seizures, and side effects of medication. R. 91-92. However, the vocational expert testified that "[t]hat would be the limit the individual could miss" and that it would "eliminate all work" if this occurred more than two times per month. Id. Additionally, the vocational expert testified that it would fully preclude all work in the national economy if the same hypothetical individual was not on-task fifteen percent of the day or more. R. 92. Lastly, the vocational expert testified that all full-time work would be precluded if the same hypothetical individual had an impairment that rendered her unable to maintain a regular employment schedule, concentrate in a work setting, complete tasks in a customary productions schedule, and was unable to regularly complete a normal work day. R. 92.

### D. ALJ's Findings of Facts and Conclusions of Law

After outlining the five-step sequential evaluation process applied to determine whether a person is disabled, R. 39-40; 20 C.F.R. §§ 404.1520, 416.920, the ALJ made the following findings of fact and/or conclusions of law at each step. First, Plaintiff had not engaged in substantial gainful activity ("SGA") since the alleged onset date of October 5, 2012.[7] R. 40. Second, the ALJ found that Plaintiff has the following severe impairments: osteoarthritis,

---

[7] As the R&R notes, "[a]lthough the ALJ found that Plaintiff earned $752.00 in 2013 when she attempted to return to work, the ALJ determined that "this amount does not rise to substantial gainful activity levels." R&R at 18 n. 9 (citing R. 40).

rheumatoid arthritis ("RA"), obesity, post-traumatic stress disorder ("PTSD"), depression, pseudo seizures, migraines, asthma, residual effects of status post Achilles tendon repair, and Eagle's syndrome. R. 41. These impairments were severe because they "caused more than minimal limitations in [Plaintiff's] ability to perform basic work activities." Id. The ALJ further determined that other alleged impairments, including acid reflux, hiatal hernia, mild degenerative disc disease, and colds were not severe. Id. Additionally, the ALJ noted that the fibromyalgia diagnosis contained in the record did "not meet the requirements set forth by the Social Security Administration needed for the determination that fibromyalgia is a medically determinable impairment." Id. Third, Plaintiff did not have an impairment or combination of physical and/or mental impairments that met or medically equaled the criteria of a listed impairment that would qualify her as disabled.

Before reaching the fourth step, the ALJ determined Plaintiff had the residual functional capacity to perform less than the full range of light work as defined in 20 C.F.R § 404.1567(b) and 416.967(b), subject to the following limitations: lifting and carrying from the waist to chest level, standing and walking four hours and sitting six hours in an eight hour work day, alternate between sitting and standing every fifteen to thirty minutes to change positions for a few minutes for comfort, avoid crawling, kneeling, and climbing ropes, ladders, and scaffolds, but able to perform other postural movements on an occasional basis, limited to simple, routine, low stress tasks (defined as tasks involving minimal changes in the routine and avoid fast-paced work such as assembly line jobs and production quotas), limited to occasional, brief, and superficial interaction with the public, coworkers, and supervisors, and avoid concentrated exposure to respiratory irritants, extreme temperatures, and humidity, and also avoid working around hazards such as moving dangerous machinery and unprotected heights. R. 44. In completing the fourth

step, the ALJ found that the Plaintiff was unable to perform any past relevant work (as an aide to the intellectually disabled and a supervisor of aides) as those positions were medium/skilled and light/skilled work as performed in the national economy, and therefore were beyond her RFC, which precludes the performance of skilled work and work requiring anything beyond light work with limitations. R. at 52. However, the ALJ found that a significant number of jobs existed in the national economy that Plaintiff could perform. R. 52.

Fifth, considering her age, education, work experience, and residual functional capacity, and the anecdotal experience of the VE, Plaintiff could perform other work that exists in significant numbers in the national economy. R. 53-54 (citing R. at 158-58 ("Exhibit B10B")). As a result, the ALJ determined "a finding of 'not disabled'" was appropriate. R. 54.

## III.   STANDARD OF REVIEW

Pursuant to the Federal Rules of Civil Procedure, the Court "must determine de novo any part of a magistrate judge's recommendation that has been properly objected to." Fed. R. Civ. P. 72(b)(3). Upon review, the Court may either "accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Id. As this Court has noted, "[t]he Court may reject perfunctory or rehashed objections to R&R's that amount to 'a second opportunity to present the arguments already considered by the Magistrate-Judge.'" Hartfield v. Colvin, No. 2:16-CV-431, 2017 WL 4269969, at *7 (E.D. Va. Sep. 26, 2017) (citing Gonzalez-Ramos v. Empresas Berrios, Inc., 360 F. Supp. 2d 373, 376 (D. Puerto Rico 2005)).

"Determination of eligibility for social security benefits involves a five-step inquiry." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002); see also Johnson v. Barnhart, 434 F.3d 650, 653 n.1 (4th Cir. 2005) (per curiam). "The claimant has the burden of production and proof in Steps 1-4. At Step 5, however, the burden shifts to the Commissioner to produce evidence

that other jobs exist in the national economy that the claimant can perform considering h[er] age, education, and work experience." Hancock v. Astrue, 667 F.3d 470, 472-73 (4th Cir. 2012) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)) (internal citation omitted). "If a determination of disability can be made at any step, the Commissioner need not analyze subsequent steps." Id. at 473 (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

First, the claimant must demonstrate that she is not engaged in substantial gainful activity at the time of application. 20 C.F.R. § 404.1520(b). Second, the claimant must prove that she has "a severe impairment . . . which significantly limits . . . [her] physical or mental ability to do basic work activities." Id. § 404.1520(c). Third, if the claimant's impairment matches or equals an impairment listed in appendix one of the Act, and the impairment lasts—or is expected to last—for at least twelve months, then the claimant is disabled. Id. §§ 404.1509, 404.1520(d); see 20 C.F.R. pt. 404 subpart P app. 1 (listing impairments). If, however, the impairment does not meet one of those listed, then the ALJ must determine the claimant's residual functional capacity ("RFC"). The RFC is determined based on all medical or other evidence in the record of the claimant's case. Id. § 404.1520(e). Fourth, the claimant's RFC is compared with the "physical and mental demands of [the claimant's] past relevant work." Id. § 404.1520(f). If it is determined that the claimant cannot meet the demands of past relevant work then, fifth, the claimant's RFC and vocational factors are considered to determine if she can make an adjustment to other work. If the claimant cannot make such an adjustment, then she is disabled for purposes of the Act. Id. § 404.1520(g)(1).

The Court's review of this five-step inquiry is limited to determining whether: (1) the decision was supported by substantial evidence on the record; and (2) the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Johnson, 434 F.3d at 653. If the

Commissioner's decision is not supported by substantial evidence in the record, or if the ALJ has made an error of law, the Court must reverse the decision. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). In deciding whether to uphold the Commissioner's final decision, the Court considers the entire record, "including any new evidence that the Appeals Council 'specifically incorporated . . . into the administrative record.'" Meyer v. Astrue, 662 F.3d 700, 704 (4th Cir. 2011) (quoting Wilkins v. Sec'y, Dept. of Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991)).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Johnson, 434 F.3d at 653 (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)) (internal quotations omitted). Substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). In performing its review, the court does "'not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ].'" Hancock, 667 F.3d at 472 (quoting Johnson, 434 F.3d at 653) (alteration in original). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." Id. (quoting Johnson, 434 F.3d at 653) (alteration in original).

## IV. ANALYSIS

Plaintiff objects to the R&R on two grounds. First, Plaintiff argues that the Magistrate Judge erred in finding that the ALJ's assessment of Plaintiff's residual functional capacity complies with Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015). Second, Plaintiff argues that the Magistrate Judge's acceptance of the ALJ's discrediting of the opinion of the treating physician is contrary to Lewis v. Berryhill, 858 F.3d 858 (4th Cir. 2017).

**A.** **OBJECTION ONE: THE MAGISTRATE JUDGE ERRED IN FINDING THAT THE ADMINISTRATIVE LAW JUDGE'S ASSESSMENT OF PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY COMPLIES WITH MASCIO V. COLVIN, 780 F.3D 632 (4TH CIR. 2015).**

Plaintiff objects to the R&R for recommending that the Court find the ALJ sufficiently accounted for moderate limitations in Plaintiff's concentration, persistence, and pace as required by Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015). ECF No. 14 at 3. Plaintiff set forth this argument before Magistrate Judge Leonard in Plaintiff's Motion for Summary Judgment. See Mem. Supp. Pl.'s Mot. Summ. J. at 12-13, ECF No. 9. Plaintiff noted that "[t]he ALJ found that Ms. Crowder had 'moderate' difficulties in concentration, persistence or pace, and moderate difficulties in social functioning" and argued that "the ALJ erred by failing to include these limitations in the hypothetical question to the VE, or otherwise provide an explanation as to how those moderate limitations...would not affect her ability to stay on task...or interfere with her ability in functioning." Id. at 12. Upon review, Magistrate Judge Leonard rejected this contention. R&R at 26-27, ECF No. 13.

Plaintiff now revisits this objection, arguing that the Magistrate Judge relied upon cases including "a limitation of working in a **non-production** oriented environment in the RFC," but that "the ALJ did not limit Plaintiff to non-production work." See Pl.'s Objs. at 4, ECF No. 14 (emphasis in original). Plaintiff proceeds to argue that "neither the ALJ's RFC assessment [n]or the hypothetical question to the VE address Plaintiff's ability to stay on task." Id. at 5. Plaintiff therefore argues that "contrary to the Magistrate Judge's finding, the ALJ did not account for moderate limitations in Plaintiff's concentration, persistence and pace as required by Mascio because the ALJ limited work based on 'fast-paced' environment compared to 'non-production' work." Id. at 5-6.

The Court has reviewed this objection _de novo_ and finds Plaintiff's arguments unpersuasive. As noted in Magistrate Judge Leonard's Report and Recommendation, "[c]ourts within the Fourth Circuit have found that an ALJ complies with <u>Mascio</u> by limiting claimants to non-production work or work not performed at an assembly-line pace, because these limitations account for a claimant's difficulty with staying on task." R&R at 26, ECF No. 13 (citing <u>Baker v. Colvin</u>, No. 3:15-CV-00637 (HEH), 2016 WL 3581859, at *3-4 (E.D. Va. June 28, 2016), _report and recommendation adopted_, No. 3:15CV637-HEH, 2016 WL 3582071 (E.D. Va. June 28, 2016); <u>Eastwood v. Colvin</u>, No. 3:15CV156 (REP), 2016 WL 805709, at *4 (E.D. Va. Feb. 12, 2016), _report and recommendation adopted_, No. 3:15CV156, 2016 WL 881123 (E.D. Va. Mar. 1, 2016); <u>Linares v. Colvin</u>, No. 5:14-CV-00120, 2015 WL 4389533, at *5-7 (M.D.N.C. June 19, 2015)). Similarly, the ALJ in this case complied with <u>Mascio</u> and sufficiently accounted for the Plaintiff's moderate limitations by restricting Plaintiff to low-stress, simple tasks, and avoiding any fast-paced work.

As such, the Court adopts and approves the Magistrate Judge's findings and recommendation for the reasons stated in the R&R.

### B. OBJECTION TWO: THE MAGISTRATE JUDGE ACCEPTANCE OF THE ALJ'S DISCREDITING OF THE OPINION OF THE TREATING PHYSICIAN IS CONTRARY TO <u>LEWIS V. BERRYHILL</u>, 858 F.3D 858 (4TH CIR. 2017).

Plaintiff objects to the R&R for recommending that the Court find the ALJ did not err by discounting the credibility of the Plaintiff's treating physician, Dr. Snider. Pl.s' Objs. at 6, ECF No. 14. Plaintiff set forth this argument before Magistrate Judge Leonard in Plaintiff's Motion for Summary Judgment. See Mem. Supp. Pl.'s Mot. Summ. J. at 16-20, ECF No. 9. Magistrate Judge Leonard determined "that the ALJ properly discounted Dr. Snider's opinion, notwithstanding his status as a treating physician because such opinion was plainly contradicted by the substantial evidence in the record." R&R at 33, ECF No. 13.

Plaintiff argues that "[w]hile the ALJ discussed the medical opinion of Dr. Snider, he failed to explain why the opinion should be discounted." Pl.s' Objs. at 9, ECF No. 14. Therefore, according to Plaintiff, "the ALJ failed to build an accurate and logical bridge from the evidence he recounted to his conclusion to assign little weight to Dr. Snider's opinion." Id. Plaintiff presented an almost identical argument before the Magistrate Judge in Plaintiff's Motion for Summary Judgment. See Mem. Supp. Pl.'s Mot. Summ. J. at 16, 18-20, ECF No. 9 ("the ALJ failed to provide good reason to discount the opinion of the longtime treating physician Dr. Snider"). Magistrate Judge Leonard reviewed this contention and rejected it. See R&R at 19-23, ECF No. 12. Plaintiff now makes an objection in order to rehash her arguments, albeit supported with additional case law. As noted, the Court may reject such rehashed arguments. Hartfield v. Colvin, No. 2:16-CV-431, 2017 WL 4269969, at *7 (E.D. Va. Sep. 26, 2017) (citing Gonzalez-Ramos v. Empresas Berrios, Inc., 360 F. Supp. 2d 373, 376 (D. Puerto Rico 2005)).

Nevertheless, the Court has reviewed this objection de novo and finds Plaintiff's arguments unpersuasive. Plaintiff now argues that the ALJ failed to "build an accurate and logical bridge from the evidence he recounted to his conclusion to assign little weight to Dr. Snider's opinion." Pl.s' Objs. at 9, ECF No. 14. In support of her position, Plaintiff cites to several cases in which the ALJ provided either perfunctory explanations or no explanation at all for discounting treating physician's opinions. See Woods v. Berryhill, 888 F.3d 686, (4th Cir. 2018) (finding that the ALJ's explanations regarding medical opinions were "conclusory" and "sparse"); Lewis v. Berryhill, 858 F.3d 858, 866-68 (4th Cir. 2017) (finding that the ALJ erred where his rejection of the "treating physician [was] perfunctory" and his analysis of the treating physician's opinion and overarching medical history contained "impermissible gaps"); Monroe

v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (noting that the ALJ's "decision to not rely on certain medical records that Monroe contends support his testimony" "lack[ed] the specific analysis that would allow for meaningful review").

Here, however, the ALJ did not merely provide perfunctory or conclusory explanations as to his determination to discount the credibility of Plaintiff's treating physician. The ALJ noted that he gave little weight to Dr. Snider's assessment "that the claimant could not work on a full time basis due to nocturnal seizures" because this assessment "goes to the ultimate issue reserved for the Commissioner." R. 50. The ALJ's discussion related to Dr. Snider's opinion did not end there. The ALJ proceeded to discuss substantial evidence contradicting Dr. Snider's opinion including consistently normal EEG and MRI studies, Plaintiff's normal mood and judgment, Plaintiff's normal attention and concentration, and the contradictory findings of the consultative examiner and state agency doctors. R. 50-52.

Therefore, consistent with 20 C.F.R. § 416.927(c)(2), the ALJ gave "good reasons in" his "decision for the weight" given to Dr. Snider's opinion. Further, the ALJ sufficiently "built an accurate and logical bridge from the evidence to his conclusion." Monroe, 826 F.3d at 189 (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)). Nevertheless, even if "the ALJ could have offered a more thorough explanation for his decision," this would not change the Court's "conclusion that substantial evidence in the record supports that decision." Dunn v. Colvin, 607 F. App'x 264, 270-71, 276 (4th Cir. 2015).

For these reasons, and those set forth in the R&R, the Court adopts and approves the Magistrate Judge's findings and recommendation.

## V.    CONCLUSION

The Court, having examined the Objections and Response to the Objections to the Report and Recommendation and having made de novo findings with respect thereto: (1) **ACCEPTS**

the R&R, ECF No. 13; (2) **DENIES** Plaintiff's Motion for Summary Judgment, or Alternatively, for remand, ECF No. 8; (3) **GRANTS** Defendant's Motion for Summary Judgment, ECF No. 10; and (4) **AFFIRMS** the decision of the Commissioner of the Social Security Administration.

The Clerk is **DIRECTED** to enter judgment in favor of defendant and to forward a copy of this Order to all Counsel of Record.

**IT IS SO ORDERED**.

/s/
Robert G. Doumar
Senior United States District Judge
UNITED STATES DISTRICT JUDGE

Norfolk, VA
September 24, 2017